MIANUS REALTY COMPANY, INC., ET AL. *v.* GEORGE
L. GREENWAY ET AL., EXECUTORS (ESTATE OF
HARRIET L. GREENWAY), ET AL.

KING, MURPHY, SHEA, ALCORN and COMLEY, Js.

Argued June 6—decided July 31, 1963

*Lawrence B. Schwartz,* with whom were *Richard W. Pinto* and, on the brief, *Joseph I. Sachs* and *Louis I. Gladstone,* for the appellants (plaintiffs).

*Daniel B. Badger,* with whom was *Charles S. Bradford,* for the appellees (named defendant et al.).

*Thomas J. O'Sullivan,* for the appellees (defendants New York, New Haven and Hartford Railroad Company et al.).

COMLEY, J. This action involves a parcel of land on the easterly side of a cove on the Mianus River in Greenwich. It is 6.34 acres in extent, and most of it is marshland or tidal flats below the high-water mark.

The finding, which is not subject to any material correction, contains these facts: On April 6, 1937, the trustees of the New York, New Haven and Hartford Railroad Company, hereinafter called the railroad, owned the land on the easterly side of the cove, and Harriet L. Greenway, hereinafter called Greenway, owned the land on the westerly side. Both parties then had full riparian rights in and to the land below the high-water mark in front of their respective premises. On that date, Greenway and

the trustees of the railroad entered into a written agreement establishing a division line between their properties "beyond which neither party will claim riparian rights or make land by filling in." This line was delineated on a map attached to the agreement and was designated "Line of Ultimate Filling." The agreement and the map were not recorded by either party at that time.

In 1951, the railroad entered into a contract with McNeil Brothers, Inc., hereinafter called McNeil, for the removal of fly ash from the railroad's Cos Cob power plant, which adjoined the land in question. McNeil needed a place near the plant on which to dump the fly ash and commenced negotiations with the railroad for the purchase of the 6.34 acres referred to above. On December 3, 1951, the railroad executed and delivered to McNeil a quitclaim deed to which was attached a map of the property described in the deed. The property was described by courses and distances, the angle of each change of direction in the boundary being given together with the exact distance of each line. The westerly and southwesterly boundaries as described in the deed and as shown on the map coincide with the "Line of Ultimate Filling" as fixed in the 1937 agreement between the trustees of the railroad and Greenway, and these two boundaries are said to be "on land now or formerly of Estate of Harriet L. Greenway." The deed to McNeil made no mention of riparian rights. McNeil had no knowledge of the 1937 agreement.

On December 17, 1951, McNeil quitclaimed the property to the Mianus Realty Company, Inc., a corporation owned and controlled by the McNeil family. Shortly thereafter, a wooden bulkhead was built along the westerly, southwesterly and south-

erly lines of the property, and although much of the area has since been filled with fly ash, there is at the present time marshland or tidal flats adjacent to the bulkhead.

On May 25, 1959, Mianus contracted to sell the property to the plaintiff Charles A. Harrison, the closing to take place within ninety days. The description in the contract was the same as in the deed from the railroad to McNeil, and that description has been used in all subsequent deeds herein referred to.

Harrison took possession of the property soon after he entered into the contract of purchase. He expended some money in leveling the tract. A few weeks before title was scheduled to close, he heard about an agreement affecting his riparian rights, but he could find no record of it. Some inquiries were then made, as a result of which the railroad recorded its copy of the 1937 agreement on August 7, 1959. Because of the 1937 agreement, Harrison at first refused to take title from Mianus, which then instituted the present action to quiet its title. While the action was pending, Harrison accepted a deed from Mianus, and he and a family corporation to which he immediately transferred title are now parties plaintiff. They wish to develop the property for use as a marina, which cannot be done unless they can exercise riparian rights.

The trial court concluded that McNeil and its successors in title took no riparian rights beyond the boundaries of the land described in the deed and map delivered to McNeil by the railroad. Ordinarily, the owner of uplands extending to the high-water mark is presumed to possess riparian rights, including the right to wharf out. *Walz* v. *Bennett,* 95 Conn. 537, 542, 111 A. 834. Such rights are freely

alienable, and they may be separated from the ownership of the uplands and separately conveyed, and, conversely, the ownership of the uplands may be conveyed exclusive of such riparian rights as may formerly have been attached thereto. *Barri* v. *Schwarz Bros. Co.,* 93 Conn. 501, 506, 107 A. 3; *Simons* v. *French,* 25 Conn. 346, 353.

Whether or not riparian rights are conveyed along with the grant of the uplands depends largely upon the intent of the grantor. Such intent is to be determined from the language of the deed and surrounding circumstances. *Barri* v. *Schwarz Bros. Co.,* supra; *Simons* v. *French,* supra, 351. One factor to be considered is the delineation of the land contained in any map which may be incorporated into or attached to the deed.

In the present case, it was the obvious intent of the railroad to convey the described uplands exclusive of any riparian rights which may have previously extended beyond the designated boundaries. The boundaries of the land to be conveyed to McNeil were precisely described by courses and distances in the deed. The description contained in the deed was identical to the description on the attached map. The lines and figures on the map designated more than the location and quantum of the premises. Such careful and meticulous lines and angles partake of the nature of boundaries. See *Barri* v. *Schwarz Bros. Co.,* supra, 510. The westerly and southwesterly boundaries coincided exactly with the "Line of Ultimate Filling," which was determined in the 1937 agreement between the trustees of the railroad and Greenway. The fact that the boundaries set out in the deed and map delivered to McNeil coincided with the "Line of Ultimate Filling" is an indication that the railroad in-

tended to convey only such property rights as existed within the limits of the carefully designated boundaries. The railroad's conveyance to McNeil was in keeping with its agreement not to exercise riparian rights beyond the "Line of Ultimate Filling." It was also in keeping with McNeil's purpose in buying the land for the dumping of fly ash between the upland and the line of the bulkhead, which line was identical with the "Line of Ultimate Filling." McNeil took no riparian rights from the railroad, beyond the boundaries of the land described in the deed to him, and it therefore follows that he could transfer none to Harrison.

Since our conclusion that the present owner has no riparian rights is based on a construction of the deeds and maps in the light of the surrounding circumstances, it is unnecessary to consider what effect, if any, followed the actual knowledge of the 1937 agreement acquired by Harrison between the date of contract and the date of his deed.

The fact that the southerly line, consisting of 120 feet, of the property conveyed by the railroad to McNeil was not mentioned in the 1937 agreement between the trustees of the railroad and Greenway does not signify that riparian rights were conveyed beyond this southerly line. This line was as carefully delineated in the deed and on the map as were the westerly and southwesterly lines. All the lines were substantially below the high-water mark, and all that the railroad could and did convey to McNeil between these lines and the high-water mark were riparian rights. The only reasonable inference is that the parties intended to treat this southerly boundary as they did the westerly and southwesterly boundaries so far as riparian rights were concerned.

The assignments of error relating to certain rulings on evidence do not require discussion.

There is no error.

In this opinion the other judges concurred.