WILLIAMS ET AL. *v.* SKYLINE DEVELOPMENT CORPORATION ET AL.

[No. 240, September Term, 1971.]

*Decided March 21, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Hamilton P. Fox,* with whom were *Hearne, Fox & Bailey* on the brief, for appellants.

*Raymond S. Smethurst, Jr.,* with whom were *Henry M. Rutledge, Robert B. Taylor* and *Adkins, Potts & Smethurst* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The principal question in this interesting case is whether the Circuit Court for Worcester County, in Equity, (Travers, J.) erred in dismissing (with prejudice) on August 16, 1971, the original or "First" petition filed on December 19, 1969, by the appellants, Adrian H. Williams and others, members of the Board of Directors of Bayshore Condominium and Elharts, Inc., developer of the condominium in Ocean City, Maryland and the owner of several units in it, praying that the appellees, Skyline Development Corporation (Skyline) and Bay Shore Development Corporation (Bay Shore), be permanently enjoined from performing certain landfilling operations in Addition "E" of Bay Shore Estates in Isle of Wight Bay; that Skyline and Bay Shore be required to restore Isle of Wight Bay to its former condition by removing all bulkheading, pilings, and fill from the area in question; to pay damages the petitioners and appellants sustained because of Skyline's interference with their rights to enjoy the waters of the Bay; to reimburse the petitioner for the cost of the suit; and for other and further relief.

The answer to the principal question depends largely upon the determination of (1) whether Skyline and Bay Shore could legally sever the riparian rights involved in the suit, reserving those rights to themselves, so as to allow them to fill in the bed of the Bay after the waterfront land had been conveyed away; (2) a proper construction of the provisions of a deed, dated July 8, 1967, from Skyline to Peter Paul Boinis—the predecessor in title of the petitioners—of Lots 270 through 276 in Block or Section "AA" on a plat entitled "Addition 'A' to Bay Shore Estates in Ocean City, Wor. Co., Maryland," duly recorded among the Land Records of Worcester County on September 1, 1961; and, (3) whether the petitioners had sufficient notice of the contemplated landfill so as to preclude them from obtaining the relief sought.

The facts are complicated. It is difficult to understand

them without the aid of a plat of the various areas involved. We have supplied such a plat by reducing in size the "Master Plan" of Bay Shore Estates, Defendants' Exhibit 2, on which we have added certain notations. The Reporter is directed to include this plat as part of our opinion in this case.

The original scale of the plat was 1 inch equalled 100 feet. The original exhibit has been reduced approximately 10 times so that the scale of the attached plat is approximately 1 inch equals 1,000 feet. Because of this substantial reduction, much of the writing on the original exhibit is so fine, that only the young with possibly better than 20-20 vision could read it. Accordingly, we have superimposed writing in larger letters to facilitate reading. The only additional material we have added to the original exhibit are the numbers of certain lots in Addition "A" together with the notation "Approximate Scale: 1" = 1,000'."

It will be noted that north is indicated by the surveyor's arrow. It will also be noted that there are five Additions, *i.e.*, "A," "B," "C," "D" and "E" marked on the plat. These Additions were marked as indicated in the original exhibit. The over-all area lies to the west of Ocean Highway, which is 125 feet wide, and between 26th Street and 32nd Street in Ocean City. All of the Additions except Addition "C" have been filled and the filling of Addition "C" had begun before the suit was filed. In Additions "B," "D" and "E," the plan of development took the form of the bulkheading and filling of "fingers" which project into lagoons and are connected by roads to the other land. Speaking generally, these "fingers" are from approximately 225 to 250 feet in width, and project into the lagoons from approximately 850 feet (Additions "B" and "D") to approximately 500 to 600 feet (Addition "E"). The roads which connect the "fingers" to the other roads are uniformly 50 feet wide and contain a circle or turntable 100 feet in diameter. The lagoons between the "fingers" are approximately 90 feet wide; but to the north of the "fingers" in Additions "B," "D" and

"E", the lagoons vary from approximately 110 to 160 feet. The lagoon immediately adjacent to Lots 270, 271, 272, 273, 274, 275 and 276, upon which the Bayshore Condominium is erected, is 90 feet in width and approximately 500 feet long connecting with another lagoon, giving ultimate access to the Isle of Wight Bay. It will be observed, too, that the bulkheading and filling has occurred and is occurring in Addition "C" up to, but within, the applicable bulkhead limit lines.

The history of the development of the Bay Shore Estates area is important in this case.

In 1955, Cullen S. Jenkins and Katie C. Jenkins, his wife, owned the fast land and marsh along Ocean Highway and to the west of that highway. On November 9, 1955, George B. Cropper, a civil engineer, acting on behalf of the owners, applied to the District Engineer of the United States Engineers' Office in Baltimore (Army Engineers) to obtain a permit for dredging and filling as shown on an attached map in the Isle of Wight Bay just north of the (then) city limits of Ocean City, the depth to be 7 feet at mean low water with an estimated 88,700 cubic yards of fill or "borrow" to be moved. An attached map shows an area to be filled on the west side of Ocean Highway between North 26th Street and 28th Street (if extended), approximately 750 feet wide and running west approximately 800 feet. The map indicates that the area to be filled is quite low. On the north side of the area to be filled, earth dikes were to be erected, and to the west, a timber bulkhead was to be built. Still farther to the west is an area approximately 400 feet by 900 feet, designated as "Proposed Borrow Area, 7' Deep." Attached to the application of November 9, 1955, was a letter, dated February 3, 1956, from the Mayor and City Council of Ocean City, agreeing to the dredging, filling and bulkhead work outlined in the November, 1955, application. The Army Engineers, on February 10, 1956, granted the application, indicating that if the proposed work was not completed by December 31, 1959, the permit would become void thereafter and further that the

assent of the Federal Government was given only so far as it concerned the public rights of navigation. Cullen S. Jenkins and wife, by a deed dated April 16, 1956, and duly recorded, had conveyed to Skyline various lots including the filled area already mentioned above.

By a deed dated June 4, 1957, Cullen S. Jenkins and wife and Skyline (and the mortgagee corporation) conveyed to Bay Shore various lots both by plat reference, in some instances, and by metes and bounds description in others, all of them being a part of the property conveyed by the deed of April 16, 1956, to Skyline.

On August 28, 1957, Mr. Cropper filed an application to fill and erect bulkheads to the west of the fast land lying to the west of Ocean Highway and the area previously filled between North 26th and 28th Streets, showing various lagoons and six "fingers" as well as two borrow areas, all as shown on an attached map. Three of the six "fingers" on the attached map were located on the north side of a 150 foot lagoon and three were located on the south side of this lagoon. The 150 foot lagoon ran in an east-west direction from approximately the center of the whole area to be filled for approximately a length of 1,000 feet. Lagoons, 90 feet in width, ran along the sides of the "fingers" into the 150 foot lagoon. The mean low water line of the fast land to the west of Ocean Highway is shown on the attached map as an irregular one running approximately in a north-south direction approximately 250 to 500 feet west of Ocean Highway. Two islands lying to the west of the shore line are shown to be completely included within the proposed area to be filled. Permission was granted by the Army Engineers on November 4, 1957, to fill and erect bulkheads as requested on August 28, 1957.

Cullen S. Jenkins and wife, by a deed dated January 19, 1959, and duly recorded on February 10, 1959, conveyed to Bay Shore the fast land and the two islands shown on the map attached to the application of August 28, 1957—"East Colliers' Island," and "West Colliers' Island," formerly called "Duck Island" and "Brant Is-

land." Thereafter, in August, 1959, Mr. Cropper, the civil engineer, acting for his company, "GBC Surveys, Inc.," prepared the "Master Plan" for Bay Shore Estates (Defendants' Exhibit 2), the reduced copy of which is filed as part of this opinion.

In June, 1960, Maddox and Hopkins, consulting engineers at Silver Spring, Maryland, prepared a "proposed development plan" for Bay Shore Estates. This plan (Defendants' Exhibit 20) indicates a subdivision into a number of building lots and significantly shows a development by the use of "fingers" and lagoons similar to the ultimate development of Additions "B," "D" and "E." Nine "fingers" are shown on the Maddox and Hopkins plan. Two of these are quite similar in outline to those ultimately appearing on the plat for Addition "E." Two "fingers" appear on a plat of what later was Addition "B" and one "finger" appears which later appeared on a plat of Addition "D." The remaining four "fingers" lying to the south of an outline of Addition "C" and east of the "finger" in Addition "D" are not shown on the "Master Plan" of August, 1959, that area being marked on the "Master Plan" as "Property of C. R. Jenkins." A substantially full-page advertisement was inserted in The Washington Post Newspaper on Friday, July 8, 1960, by Samuel E. Bogley, Inc., a real estate broker in Ocean City, making an "Introductory Offer" for that week end of building lots of "Choice Waterview and Waterfront Homesites Just 1 Block from the Beaches of the Atlantic Ocean," with lots priced from $3,500 in a development called "Bayside-on-the-Ocean." The "proposed development plan" prepared by Maddox and Hopkins, showing the nine "fingers" and lagoons, was printed in full and under it appeared the following legend:

"Sketched above the site plan of BAYSIDE-on-the-Ocean with deep water, bulkheaded canals providing access to waterfront homesites. Truly Florida living just a few short hours from downtown Washington or Baltimore!"

In a large circle immediately above the sketch appears the following language:

"The New Venice of the Mid-Atlantic Coast where you can actually dock your boat in your backyard!"

A large handbill in yellow and black identical to the advertisement was also printed for use in selling the lots.

On April 18, 1961, Mr. Cropper requested a modification by the Army Engineers of the November 4, 1957, permit to dredge, fill and construct bulkheads by extending the easterly channel of the property to the property of Charles Brown. Public notice of this request was given on May 8, 1961. The notice was an extensive one going to the Maryland Members of the United States Senate, to the Member of the House of Representatives for the District, to a number of Federal, State and County Agencies, to public and quasi-public agencies and associations and to some 8 newspapers or their editors. The attached map rearranged within the over-all area the six "fingers" appearing on the November 4, 1957, map to place all of these "fingers" on the southerly side of a relocated lagoon 110 feet wide, with connecting lagoons 90 feet wide, rather than three "fingers" on each side of a 150 foot lagoon with connecting lagoons 90 feet wide. Apparently no objection was given at the hearing. On June 12, 1961, a permit was issued by the Army Engineers.

In September, 1965, Mr. Cropper's office prepared a plat for the Worcester County Shoreline Commission, entitled "Bulkhead & Borrow Area Limit Lines; Ocean City, Worcester County, Maryland." This plat was recorded on October 28, 1965, among the Plat Records of Worcester County in Liber E.W.R. No. 1, folio 34 and was introduced into evidence as "Defendants' Exhibit 34." This plat clearly shows the fast land lying to the west of Ocean Highway between North 26th and North 32nd Streets, two islands still farther west and the applicable bulkhead and borrow lines. Mr. Cropper, during his testimony, placed an "X" on the area of the Jenkins prop-

erty. The plat shows the fast land as having a very irregular waterfront line with a deep cove running to within approximately 400 feet of Ocean Highway. The land to the south of this cove extends at a rather steep angle to a distance approximately 2,000 feet from the west side of Ocean Highway. The land to the north of the cove extends on a more gradual angle to a maximum distance of about 1,100 feet from Ocean Highway. The bulkhead line is substantially the same as that shown on the Master Plan attached to this opinion. The borrow line runs parallel to the bulkhead line some 450 feet west of it. The two islands are small, one being approximately 250 feet long and 150 feet wide at its widest point; the other is approximately 250 feet long and 150 feet wide at its widest point. They lie approximately 50 and 150 feet from a point of the fast land and are approximately 250 feet from each other.

An important plat was recorded among the Land Records of Worcester County on September 1, 1966, Liber E.W.R. No. 1, folio 44. This plat is for Addition "A," and was prepared by Mr. Cropper in August, 1966. Addition "A," as shown on this plat, is the area marked "A" on the Master Plan. Its easterly line is approximately 550 feet east of a line parallel to Gull Way and runs from the south bulkhead limit line to north of Eagle Drive. The north side of Eagle Drive is its northern boundary line until that line reaches Lot 276. Lots 270, 271, 272, 273, 274, 275 and 276 are included in Addition "A" as well as Lot 225 to the west of Bay Shore Drive so that the northerly boundary lines of those lots (and the end of Bay Shore Drive) form the northern most boundary line of Addition "A." The westerly boundary line is the bulkhead limit line. On the recorded plat for Addition "A," there are three "hash" lines running into Isle of Wight Bay, one from the westerly line of Lot 225, one from the easterly line of Lot 225 (and the westerly line of Bay Shore Drive), and the third is from the easterly line of Bay Shore Drive where the lots and Bay Shore Drive end on Isle of Wight Bay. Written above

the ends of those broken, projecting "hash" lines appears the following: "(future extension)." The same notation appears approximately in the center of the space in Isle of Wight Bay directly north of the north side of Eagle Drive and east of the easterly line of Lot 276. On the Addition "A" plat, Gull Way dead-ends at Eagle Drive. The plat for Addition "A" contains the legend "Approved, Mayor and City Council Ocean City, Wor. Co., Maryland" and this was duly signed by the Mayor and by the President of the City Council of Ocean City.

The State of Maryland, acting through the Board of Public Works, executed a deed on October 31, 1966, reciting that the Worcester County Shoreline Commission, at a special meeting on October 11, 1966, after proper notice, approved and ratified the bulkheading and filling operation performed by Skyline in the area bounded on the south by North 26th Street and on the north by North 32nd Street in Ocean City; that the municipality of Ocean City had, since 1946, a comprehensive zoning ordinance and other ordinances regulating subdivisions, platting of properties and the dedication of streets and other public easements; that Skyline was now extensively developing the area mentioned; and, that the municipality of Ocean City had requested the deed from the State "in order to be able to more efficiently enforce dredging and filling operations within [its] corporate limits." The State by the deed conveyed to the Mayor and City Council of Ocean City "all its right, title, interest and estate in and to the bed of that portion of Isle of Wight Bay bounded . . . ," the description of the area then being given. This deed was duly recorded the same day among the Land Records of Worcester County in Liber F.W.H. No. 213, Folio 658, *et seq.*

On the same day, October 31, 1966, the Mayor and City Council of Ocean City conveyed all of its right, title, interest and estate to Addition "A" to Skyline. This deed was duly recorded the same day among the Land Records of Worcester County in Liber F.W.H. No. 213, Folio 665, *et seq.* This deed recited the prior recordation of the

deed of October 31, 1966, from the State to the Mayor and City Council of Ocean City; that the plat for Addition "A" had been duly recorded on September 1, 1966, and, except for two identified parcels, was owned by Skyline; that Skyline had conveyed its right, title and interest in and to the streets, drives, avenues, lanes and ways appearing on the recorded plat, which were to be at least 50 feet wide and were to be used in connection with the public thoroughfares in conjunction with the public street systems of Ocean City; and, that Skyline had complied with all subdivision requirements and other pertinent ordinances and regulations of Ocean City.

On July 8, 1967, a deed, quite important to the present case, was executed by Skyline whereby Lots 270, 271, 272, 273, 274, 275 and 276 in Addition "A" were conveyed to Peter Paul Boinis, his heirs and assigns, in fee simple, but subject to the provision and reservation hereinafter made. The provision and reservation are as follows:

> "PROVIDED, HOWEVER, that the grantee herein, his heirs and assigns, shall have no right to extend said lots beyond their present lines, as shown on the aforesaid plat, by causing, in any manner whatsoever, artificial accretion thereto; the grantor herein hereby expressly reserving unto itself, its successors and assigns, all lands, as shown on the aforesaid plat, adjacent to said lots which lie beneath the waters of Isle of Wight Bay; PROVIDED, FURTHER, HOWEVER, that the grantee herein, his heirs and assigns, shall enjoy the use of adjacent waters of Isle of Wight Bay, except on the Easterly side of Lot No. 276 if the grantor herein decides to reclaim the same, and he, his heirs and assigns, shall have the right to construct a wharf or dock, not to exceed three (3) feet in width, from said lots into the waters of Isle of Wight Bay for a distance not exceeding twenty-eight (28) feet."

This deed then recited that the land was a part of the same property "with natural and artificial accretions thereto," conveyed to Skyline by Bay Shore by its deed of May 2, 1966, and recorded among the Land Records of Worcester County in Liber F.W.H. No. 204, folio 28, *et seq.*, and by the deed of October 31, 1966, from the Mayor and City Council of Ocean City to Skyline.

The habendum clause provides:

"TO HAVE AND TO HOLD the above conveyed property unto the said Peter Paul Boinis, his heirs and assigns, forever in fee simple, subject, nevertheless, to the provision and reservation concerning riparian rights hereinbefore made."

There were the usual covenants of special warranty and further assurances. The consideration for the deed was $51,000.00.

The plat for Addition "B" of Bay Shore Estates was prepared on behalf of Mr. Cropper's company in January, 1968, by Jack Mumford and surveyed by N. R. Jones. It was approved by Mr. Cropper. It was duly recorded on April 9, 1968, among the Land Records of Worcester County in Liber F.W.H. No. 9, Folio 12. This plat also has a legend indicating approval by Ocean City and, in addition, has a legend indicating approval for public water supply and sewerage systems by the Worcester County Health Department on April 9, 1968. Addition "B" consists of the two "fingers" shown on the Master Plan and marked "B."

Boinis entered into a written contract of sale on May 12, 1968, with David Strahle to sell him the seven Lots, Nos. 270 through 276, in Addition "A" for $63,000.00. There is no mention in the contract of sale of the provisions and reservation in the deed of July 8, 1967, from Skyline to Boinis.

On June 26, 1968, Boinis conveyed the seven lots in Addition "A" to Elharts, Inc. (a nominee of Strahle),

by number of the Lots (270 to 276) and by reference to the plat of Addition "A" recorded on September 1, 1966, in Plat Book E.W.R. No. 1, folio 44. The deed is on a printed form and contains covenants of seisin, right to convey, special warranty, further assurances, and the covenant against encumbrances. It contains no habendum clause.

Elharts, Inc., on March 1, 1969, pursuant to Code (1966 Repl. Vol.) Art. 21, §§ 117A to 142 (Horizontal Property Act—Laws of 1963, Ch. 387) executed a Master Deed for "Bayshore Condominium West, Inc.," the horizontal property regime established to be known as "Bayshore Condominium." Two schedules are attached to this Master Deed. Schedule "A" states that Lots numbered 270 and 271, all in Block "AA" on the plat of Addition "A" were recorded on September 1, 1966, in Plat Book E.W.R. No. 1, folio 44. It also states that upon addition and upon modification of the Master Deed, Lots 272 through 276 "shall become and be thereafter part of this Master Deed. Schedule "A" then provides:

> "Saving and excepting and reserving unto Elharts, Inc., the right to construct boat slips beyond the bulkhead and attached said boat slips to the bulkhead noted on survey and plat attached to this Master Deed. Said boatslips to remain the exclusive ownership of ELHARTS, Inc."

Schedule "B" designates the plans for the condominium with a brief description of how the building is to be constructed. It was noted that by amendment Bayshore Condominium Central and East shall become a part of the Master Deed.

In Paragraph Seventh in the body of the Master Deed, the unit numbers, values and percentages of the total value of $240,000.00 comprising Bayshore Condominium West are given. The unit numbers are Nos. 1 to 24, inclusive, the dollar value of each unit is given as $10,-000.00 and the percentage of value for each unit is given as 4.167%.

Elaborate Bylaws for Bayshore Condominium West, Inc. are then given, consisting of some 18 legal-size pages.

This deed, with its schedules and bylaws, was recorded on April 23, 1969, among the Land Records of Worcester County in Liber F.W.H. No. 249, folios 633 through 660.

On April 15, 1969, a First Amendment was made to the Master Deed of March 1, 1969, whereby Bayshore Condominium Central was added as contemplated by the Master Deed. The First Amendment recites this and that Lots Nos. 272 through 276 become a part of the Master Deed. It further recites that all of the improvements described in the plats have been constructed, or are in the process of construction. The units comprising Bayshore Condominium Central are Nos. 24 to 48, with an individual value of $10,000.00, a total value of $240,000.00 and a percentage of value for each unit of 4.167%. A Schedule "A" is attached and refers to Lots 272, 273 and 274 shown on the plat for Addition "A" recorded September 1, 1966, and states that upon the addition and upon modification of the Master Deed, Lots 272 through 276 shall become part of the Master Deed. The same provision in regard to boat slips, as appeared in Schedule "A" attached to the Master Deed, is then set forth.

Schedule "B" identifies the plat plans for Bayshore Condominium Central and how the building is to be constructed. The Bylaws of Bayshore Condominium Central are then attached, adopting with three exceptions the Bylaws—already recorded with the Master Deed—of Bayshore Condominium West, Inc.

This First Amendment was recorded on June 4, 1969, among the Land Records of Worcester County in Liber F.W.H. No. 253, folios 493 through 498.

The Second Amendment to the Master Deed of March 1, 1969, was by a deed dated April 15, 1969, to add Bayshore Condominium East to the Master Deed. The units comprising this condominium are units Nos. 49 through 72 and, here again, their individual value was given as

$10,000.00, their total value as $240,000.00 and the individual unit percentage of value at 4.167%. The Bylaws are given, adopting the Bylaws of Bayshore Condominium West, with four exceptions. Schedule "A" refers to Lots Nos. 275, 276 and 274 referred in the plat of Addition "A" recorded on September 1, 1966, noting that upon this amendment to the Master Deed Lots Nos. 272-276 were incorporated and made a part of the Master Deed. The identical provision in regard to boat slips, as appeared in Schedule "A" to the Master Deed and the First Amendment deed, also appears in Schedule "A" attached to the Second Amendment deed.

Schedule "B" identifies the plat plans and has provisions in regard to the construction of the buildings. No record reference is given for the Second Amendment, nor is the copy of this deed conformed in regard to signatures, dates of acknowledgements, etc., although the typed name of David Strahle, President of Elharts, Inc., appears in the body of the acknowledgment.

The photostatic copies of the Master Deed and the First Amendment deed indicate that they were signed by David Strahle, President on behalf of Elharts, Inc., attested by Evelyn Strahle, Secretary, and that Mr. Strahle, as President of Elharts, Inc., acknowledged the deeds on behalf of that corporation.

Photostatic copies of the Master Deed, of the First and Second Amendment deeds, together with photostatic copies of three additional deeds, i.e., (1) deed of July 8, 1967, from Skyline to Boinis, (2) deed of June 26, 1968, from Boinis to Elharts, Inc. and (3) deed of March 3, 1969, from Elharts, Inc. to Adrian H. Williams for Apartment No. One (1) of Bayshore Condominium West, recorded among the Land Records of Worcester County in Liber F.W.H. No. 250, folio 1; all are stapled together and introduced as one exhibit—Plaintiffs' Exhibit 4.

On November 6, 1969, the development plan for Addition "D" to Bay Shore Estates was recorded among the Land Records of Worcester County in Liber F.H.W. No. 12, folio 32. The plat was prepared in the offices of

G.B.S. Surveys, Inc. in October, 1969, and was approved by Mr. Cropper. The survey was by N. R. Jones and the plat was drawn by C. E. Carrington. This plat shows the "finger" appearing on the Master Plan attached to this opinion and marked "D."

On November 25, 1969, the Army Engineers, in accordance with a request of November 14, 1969, for a modification of the permit approved on June 12, 1961, granted the requested modification in accordance with an attached plat. The modification on the attached plat was to grant permission to dredge, fill and erect bulkheads for "fingers" and connecting filled land for what appears on the Master Plan as Addition "E." Theretofore, the permit had provided for two "fingers" of substantially the same size and running in the same direction as the "fingers" involved in Additions "B" and "D," with 90 foot lagoons between those "fingers." It is significant to observe that on the map attached to the permit a substantial part of the original shore line clearly appears in broken lines and upon the outline of the two "fingers" appearing on the plat for Addition "B" appear the word and figures: "Filled 1967." On the "finger" appearing on the plat for Addition "D," the word and figures "Filled 1969" appear. These notations corroborate the testimony of Charles R. Jenkins (son of the late Cullen R. Jenkins), President of Skyline (since 1956 or 1957) and also of Bay Shore (since 1960 or 1961), that the filling of the area shown on the plat for Addition "A" occurred in 1965 and 1966; for Addition "B" in 1967 and the first part of the year 1968; and Addition "D" the filling began in June, 1969, and was completed in the fall of 1969. Mr. Jenkins also testified that the filling of the filled area shown on the plat for Addition "E" was begun in October of 1969 and was completed in February of 1970.

In February, 1970, G.B.S. Surveys, Inc. prepared a plat showing Addition "E" to Bay Shore Estates. This plat depicts the two "fingers" running in an easterly direction from Bay Shore Drive and marked "E" on the

map of the Master Plan attached to this opinion. This plat was unrecorded at the time of the hearing on June 18 and 19, 1970.

At the hearing in the lower court on June 18, 1970, Adrian H. Williams, one of the petitioners, President of Bayshore Condominium, owner of Unit No. 1 in that condominium and a retired hydraulic engineer, testified for the petitioners that he purchased his unit in November, 1968, and made settlement on March 3, 1969. At that time, there was only an expanse of water for several miles to the north of his unit. He first became aware of any obstruction or construction being done to the north of his property in October, 1969. He and other purchasers of units bought them because of the view. The water in the lagoon to the north of his property is "too stagnant" for swimming. He estimated that the unit for which he paid $15,000, he would only have paid $10,000 at most if it had been "in its present condition." On cross-examination, Mr. Williams admitted that no one on behalf of Skyline ever made any representations to him that the view was to be in perpetuity. He bought the unit as a result of the sale's efforts of Mr. Strahle, who is President of Elharts, Inc., and that some of Strahle's literature indicated that there was an open view of the Bay, it stating "directly on Bay with beautiful view." Mr. Williams assumed that there would be no obstruction to the north of his property; but he did not "ask Mr. Strahle the question directly" and "no one * * * made any overt representations to [him] that there would be any obstruction to this view." The first time Mr. Williams had seen the recorded plat of Addition "A" was in court the first day of the hearing. He identified Lots Nos. 270 through 276 on which the condominium was built and observed the two notations of "future extension," as well as the "hash" lines. He frankly admitted that these notations would have indicated to him that "some extension out here was planned" and that when he first examined the property, "the fill to the east [of Lot No. 276] was already in place" and was "obviously newly constructed."

He further stated on recross-examination that if he had seen the recorded plat for Addition "A" with the legends "future extension" on it, he "would have checked into it to see what was involved in future extensions."

Anthony Calapristi, who purchased four units in the condominium for investment, testified for the petitioners. He stated that Mr. Strahle said nothing about the existence or continued existence of the view; but his literature indicated in his brochure that the land was "Bay front" or "directly on the Bay with beautiful view, something like that." When he purchased his units, he saw a "finger" running "immediately up to the easterly line of Lot No. 276" and "also another finger to the east of that finger." Had he seen the recorded plat of Addition "A" (Plaintiffs' Exhibit 3) bearing the legends "(future extension)" when he purchased his four units, he "would have checked into the matter * * * before purchasing."

David Strahle also testified for the petitioners. He lived at Silver Spring, Maryland, was a real estate developer, was President of Elharts, Inc., and its principal stockholder. He purchased Lots Nos. 270 through 276 through the Robert Bounds Real Estate Agency in Ocean City. Bounds showed him a plat showing Lots Nos. 270 through 276 and also Lot No. 225. This plat apparently did not have on it any "short marks or * * * any wording written in the plat." This plat, although marked as Plaintiffs' Exhibit No. 14 for identification, was not introduced into evidence, Strahle stated that, at the time of his purchase of the lots from Boinis, he was aware of the language in the deed of the lots from Skyline to Boinis. This deed "was taken from the records even before I purchased it and examined by my attorney. We went over it quite carefully." [1] He stated that he was not interested

---

1. The trial court stated in its opinion: "This Court simply does not believe the latter assertion [*i.e.* that Strahle and his attorney examined the Skyline-Boinis Deed quite carefully before he purchased it]. Strahle obligated himself to purchase the property on the very first day that he learned it might be available. He was not furnished a copy of the Boinis' Deed by Bounds or Lane and as it was Sunday, the county land records were not available to him or his attorney (even if in the area). The fact of the matter is that,

in purchasing property that was not bay front because he believed that there was quite a difference in values and in the ability to sell "property on bay front as opposed to non-bay front." He thought that the three units still owned were "roughly" $5,000 to $6,000 less in value because of the filling and bulkheading to the north of the condominium. Strahle stated that when he was shown various areas by Bounds, he remarked that, when looking at the plat showing the seven lots, he thought the seven lots "look like the better property. They have a wide open view here and nothing was said to the contrary when I made that statement." This statement was made in front of Bounds and another salesman. When shown the recorded plat of Addition "A," on cross-examination, he was asked if he had been shown that plat, "would that have altered your decision in any way with respect to the purchase of these lots?" Strahle replied, "Well, it's hard to say. I don't know that I can answer that question." He admitted that he knew that all of the land of the seven lots was "filled or made land." He observed that there were extensions to the east of Lot No. 276, and they were shown on the plat he was given. He further admitted that there was nothing in the Skyline-Boinis Deed that "prescribes any particular amount of water" and that he understood from the language of that deed that Skyline was "reserving riparian rights." He also stated that the seven lots "in the vernacular of the real estate profession" were "waterfront lots," even with the fill to the north of them. Strahle testified also that he had received a verbal opinion from his counsel that the title to the seven lots was "a good title" but no opinion was expressed as to the riparian water rights that went

---

to use his own words, Strahle 'was relying on the plat that was given to me.' Although no one apparently said so, Strahle 'assumed this was the recorded plat.' Despite the fact that his attorney, Robert W. Carney of Langley Park, was supposed to have examined the title to those Lots, Strahle and his attorney studied only the unrecorded plat obtained from Bounds. In fact, Strahle admitted that he had never seen the plat of Addition A prior to trial." We cannot say that the trial court's conclusions of fact were clearly erroneous, Maryland Rule 886.

with this property. Although boats can come into the seven-lot area, the bulkheading makes the use of the lagoon to the north of these lots "very limited and very inconvenient." One cannot water-ski right up to the Bay-shore Condominium nor can one operate a sailboat there. It is, however, possible to get from the condominium to the Bay via the existing lagoon because he has "seen boats come in," although they have to go around the extension.

Donald W. Marks, a patent attorney for Western Electric Company, was the last witness for the petitioners. He testified that he owned Unit No. 72 in the Bayshore Condominium. He stated that before purchasing his unit, he asked an agent for Strahle—a Mrs. Joy Houghton—the "specific question": "Would there be any further filling out in front?" and "pointed to the north, out in the area where the view was." Mrs. Houghton replied that there "would be no filling out there." Mrs. Houghton, however, did not show him a plat. When the recorded plat of Addition "A" was shown to him, and the words "future extension" on the plat pointed out to him, he stated that he had never seen the plat prior to the day before and that if he had seen the plat and those words, he would have "wanted to read the deed that went back in title to this to find out exactly what had been granted, certainly." He finally stated, after some prodding by the trial court, that he would not have bought the property.

On behalf of the respondents and defendants below, a representative of the Army Engineers identified the various permits and accompanying maps to which reference has already been made. These were introduced into evidence, with appropriate statements in regard to what they indicated.

As we have stated, Charles R. Jenkins testified for the defendants and a portion of his testimony in regard to the various bulkheading and filling operations has already been summarized. He also testified that the Maddox and Hopkins Plat, already referred to, was for four or

five years on public display on a wall of the offices of the Bounds Real Estate Agency and covered the entire wall of one of the rooms in those offices. This plat was taken down during some remodeling operations; but the Master Plan showing the entire development was then "tacked on the wall" in the Bounds offices in the room used by Bounds "as a closing room, a room where purchasers and the salesmen could get together for final conference." This Master Plan was also given to the Mayor and City Council of Ocean City, as well as to all realtors. Boinis was shown the Master Plan and was told that there "would be lagoon-front lots as future developments took place." Jenkins had not met Strahle until the early summer of 1969. Neither Strahle, nor anyone on his behalf, had asked Jenkins about the road running between Lots Nos. 225 and 270 on the plat of Addition "A." If Jenkins had been asked, he would have told Strahle, or anyone representing Elharts, Inc., of his future plans of development "just as I have told everyone else in the area." Jenkins decided to proceed with actual construction of Addition "E" in late September or early October of 1969, having been delayed before that by the "money situation." It is not the practice to record plats of proposed filled land until the actual filling operation has been completed. Jenkins explained his arrangement with the municipality of Ocean City, as follows:

> "Under my arrangement with the Mayor and City Council of Ocean City and as per agreement with the Board of Public Works of the State of Maryland, as the development is completed according to the specifications and standards of the City of Ocean City subdivision ordinance, then at that time the City of Ocean City will deed the land in question to the developer for whatever interest they may have or may not have."

Jenkins further stated that a deed from the Mayor and City Council of Ocean City would ultimately be given

for the land shown in Addition "E" and stated that there "are two schools of thought regarding that land."

"Question No. 1 is that I was, I guess, the originator of a movement to clear up whatever rights the State of Maryland thought that they may or may not have.

"The Board of Public Works at the time conceded to me, and the City of Ocean City, that they had no rights.

"However, to clear the air, to clear any title defect on this property in question between 26th and 32nd Streets in Ocean City, they agreed to convey to the City of Ocean City all their right, title, and interest in the bottom of this land for whatever right, title, and interest that may be.

"Now, my attorneys—myself and I think the legal profession at home, especially in Worcester County, don't believe that the state does in fact have right, title, and interest where these riparian rights are concerned.

"However, to clear the air, we do secure a deed from the City of Ocean City which is final chain from the State of Maryland."

Jenkins further stated:

"That legislation [in Ocean City in regard to subdivisions] was [for] the protection of the people and the protection of the city. The legislation simply was this: That any developer must, at his expense, put in sewer, put in water, put in roads, proper drainage and proper grade elevation as a hammer and as a wedge for the city over any developer.

"These things must be done before the city would give up whatever title or interest they had in the property."

The quitclaim deed from the municipality "will be

forthcoming when the sewer, water and roads are in," and Jenkins added:

> "I might add, * * *, I can get the quitclaim deed within ten minutes by taking a certified check along with the contracts, signed contracts, of the work to be done to complete this and place it in the hands of the City Clerk. They will allow a deed to be written immediately. They just want to be assured the work is going to be fulfilled according to the subdivision ordinance."

He also pointed out that the municipality of Ocean City had granted approval for the Master Plan of development between the years of 1957 and 1960.

Jenkins further pointed out that he owned the land between 26th and 32nd Streets and that he had never sold his riparian rights. He did sell the Lots Nos. 270 through 276 to Boinis but retained the riparian rights.

Jenkins stated that Strahle had purchased the seven lots in Addition "A" from Boinis for $9,000.00 each. Later Strahle or Elharts, Inc. purchased lots in Addition "D," considerably to the east of the seven lots, for $10,000.00 each. Jenkins also stated that every lot in Addition "E" sold for the same price, the lagoon lots having no different value.

Boinis also testified for the defendants. He stated that when he purchased the seven lots, he knew that he had the riparian right "for 28 feet to build dock piers in front of the condominium units" and he knew that "something was going to go in front of the property."

George B. Cropper, the surveyor and civil engineer, who prepared many of the plats and documents to which reference has already been made, testified for the defendants that he had been engaged in his profession for 40 years. During the war years, he worked for the Corps of Engineers. He was a member and Chairman of the Worcester County Shoreline Commission since its inception in 1965 until his resignation in the spring of

1970. He identified the plat of the Shoreline Commission recorded on October 28, 1965, and explained that the bulkhead and borrow lines for the Jenkins property were drawn to conform to the permit from the Army Engineers "then in existence to Mr. Jenkins." When asked about his purpose in placing the two legends "future extension" on the plat for Addition "A," he stated that the area shown with lots had been developed and met local requirements but the whole area had not been fully developed and the legends were placed on the plat to show that there would be future development to the north of the lots and that this was "a conventional or accepted method of showing future development on the plats." Mr. Cropper explained that the plat without his signature and without the legends which Mr. Strahle apparently saw was a preliminary one used in the course of making the final plat—"like a scratch pad in an attorney's office."

Rhem Lane, a salesman for Bounds Real Estate Agency, testified for the defendants. He stated that he was present when Strahle came into the Bounds offices on Sunday, May 12, 1968. Strahle was interested in purchasing lots on which to build condominiums and wanted to know if any lots were for sale in Bay Shore Estates. He told Lane that "he had been over everything pretty thoroughly and wanted to try to find something that he could build on immediately. Different lots were discussed using a plat and going over each lot around the waterfront and the lagoon fronts."

The lots purchased by Strahle were the Boinis lots. These lots were not listed for sale, however, but since they were bought for speculation, Lane thought Boinis was "the type [of] man [who] would take a profit." He telephoned Bounds, who gave Lane a price of $10,-000 per lot. Strahle said that he would have to think it over and meet somebody. Later Bounds came down to the office and, still later, Strahle returned and said he wanted to make an offer of $9,000 each for the lots. Strahle then went over the lots, "wanted to know their

sizes and so forth. These sizes were shown to him on the plat and also we offered the lots for sale in the future finger that was to be built." A proposed contract of sale was then prepared, and Strahle signed it that day. Bounds and Lane took the proposed contract to Boinis in Washington to get him to sign it. The plat shown to Strahle was the recorded plat for Addition "A" and had the words "future extension" on it. Lane identified Plaintiffs' Exhibit 3 (the recorded plat) as the plat shown Strahle.

After the conclusion of the trial and while the lower court was awaiting a copy of the transcript of the testimony and memoranda of law from counsel for the parties, the petitioners, on November 25, 1970, filed a "Second" petition in the case, alleging that the defendants and respondents had commenced another filling project in Addition "C" and prayed for a temporary injunction pending suit. Judge Travers, at a conference in chambers, indicated that he would not sign an order staying the work on Addition "C" pending disposition of the case. Although the petitioners did not present to the lower court any request for a show cause order or for a hearing, they contended before Judge Travers that the defendants had no right to fill Addition "C" in that (1) no one has a right to fill in State waters; (2) the filling is in violation of the covenants and rights granted by the Boinis Deed; and (3) the defendants failed to comply with the provisions of the Worcester County Shoreline Commission Act which required a recorded plat of the proposed improvements and a permit from that Commission.

In a carefully considered opinion, Judge Travers gave his reasons for concluding that he should dismiss, with prejudice, both the First and Second petitions. In our opinion, Judge Travers was correct in his conclusions and we will affirm his order of August 16, 1971, dismissing both petitions.

(1)

The appellants earnestly contend that under the provi-

sions of Code (1957) Art. 54, §§ 45 and 46, codifying the Laws of 1862, Chapter 129 (repealed by the Acts of 1970, Ch. 241, § 2, but applicable to the present case), the riparian right of the owner of land to make improvements in navigable waters in front of his land being an *exclusive* right may not legally be severed from the land and hence the provision and reservation in the Boinis Deed by Skyline was null and void. We do not agree with this contention.

We have recently considered in some detail the history and nature of riparian rights in Maryland, and it is not necessary to review that consideration here. In *Board of Public Works v. Larmar Corp.*, 262 Md. 24, 277 A. 2d 427 (1971), Judge Finan for a unanimous Court, after reargument, in a comprehensive and careful opinion, reviewed the history of riparian rights in England and in Maryland, as well as our prior decisions both prior and subsequent to the Act of 1862, Ch. 129. We concluded that under the Act of 1862, the riparian owner had no vested title to the land covered by navigable water immediately in front of his property—such title being vested in the State as successor to the Rights of the Lord Proprietor granted to him by Section 4 of the Maryland Charter from King Charles I to Cecilius Calvert, Baron of Baltimore—nor to the improvements built out of the water until such improvements had been actually completed at which time the title to such improvements vests in the riparian owner. This is a valuable property right which cannot lawfully be destroyed or interfered with by other persons. The Act of 1862 provided that after its effective date, no patents should be issued by the Land Office for land under navigable waters of the State. One of the riparian rights is to erect and fill in front of the owners' fast land, subject to the paramount rights of the public to navigation, which are protected, so far as the United States is concerned, by the Army Engineers under an applicable Act of Congress. We have never had occasion heretofore to hold that the riparian rights to wharf out, erect bulkheads and fill in front of land may

lawfully and effectively be severed from the land by grant or reservation. We now hold that they may be so severed.

There have been intimations by the Court that riparian rights were severable from ownership of the fast land under local statutes somewhat similar in purpose to the Act of 1862. See the Act of 1745, Ch. 9 for the benefit of Baltimore City and the Act of 1824, Ch. 33 for the benefit of the town of Port Deposit. See *Tome Institute v. Crothers,* 87 Md. 569, 585, 40 A. 261, 266 (1898) construing the Act of 1824, Ch. 33 and *Mayor and City Council of Baltimore v. Canton Co.,* 186 Md. 618, 626-27, 47 A. 2d 775, 779 (1946) where Judge (later Chief Judge) Markell, for the Court, stated:

> "In *Tome Institute v. Crothers,* 87 Md. 569, 40 A. 261, 266, it was held that a riparian owner could sell his 'water privilege' under the Act of 1824, Ch. 33, and retain his land. The Act of 1824 gave to riparian owners at Port Deposit 'a right of the same description' as the right to improve under the Act of 1745."

The relevant portions of the Act of 1862 (Art. 54, §§ 45, 46 and 48) are as follows:

> " '*WHEREAS,* Doubts are entertained in regard to the extent of the rights of proprietors of land bounding on navigable waters, to accretions to said land, and to extend improvements into said waters; for the purposes of solving such doubts, therefore,' "

> \* \* \*

> " '[Sec. 45] The proprietor of land bounding on any of the navigable waters of this State, is hereby declared to be entitled to all accretions to said land by the recession of said water, whether heretofore or hereafter formed or made by natural causes or otherwise, in like manner and to like extent as such right may or can be

claimed by the proprietor of land bounding on water not navigable.

" '[Sec. 46] The proprietor of land bounding on any of the navigable waters of this State, is hereby declared to be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements, and other accretions as above provided for, shall pass to the successive owners of the land to which they are attached, as incident to their respective estates. But no such improvement shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made.

" '[Sec. 48] No patent hereafter issued out of the Land Office shall impair or affect the rights of riparian proprietors, as explained and declared in the two sections next preceding this section, and no patent shall hereafter issue for land covered by navigable waters.' "

The appellants emphasize the word "exclusive" in § 46 as indicating a legislative intent to confer the right to make improvements in front of the fast land only upon the owner of the fast land itself, and such a right cannot be held by any one other than the owner of the fast land to which the riparian right is attached. In this way, the prior decisions in regard to the Act of 1745, Ch. 9 and the Act of 1824, Ch. 33 are sought to be distinguished, in addition to the fact they were local, rather than public general laws, containing somewhat different language.

Our predecessors, however, in *Goodsell v. Lawson*, 42 Md. 348, 373 (1875), in considering certain improvements in the navigable waters of the Annamessex River in Somerset County, stated:

"Again in making the improvements, the proprietor is not compelled, as has been argued, to commence them at the shore, but may begin at

the outer extremity of the projected improvement, and extend the same to the bank of the river, which it clearly appears was the design in the present case.

"The Code provides that such improvements 'shall pass to the successive owners of the land to which they are attached, as incident to their estate.' It does not follow from this, that the title to the improvements when made, may not be severed from that of the mainland and be conveyed to and held by other persons having no interest in the original tract. The right of the riparian proprietor to such improvements, necessarily carries with it such power of alienation as owner thereof."

The word "exclusive" in § 46 was intended to indicate that after the effective date of the Act of 1862, the State should not have the power to grant the riparian right to others. This is further emphasized by the provisions of § 48 prohibiting the issuance of patents from the Land Office which might "impair or affect the rights of riparian proprietors." See *Board of Public Works v. Larmar Corp., supra* (262 Md. 24, 277 A. 2d 427 (1971)). There was no intent to prohibit or impair the right of the then riparian owner to alienate the riparian right to make improvements in front of his fast land so long, of course, as the exercise of such a right did not interfere with the navigation of the water.

The authorities generally and from other States support the alienability of riparian rights by the then owner of the fast land.

Professor Tiffany in 2 Tiffany, *The Law of Real Property,* § 667, pp. 723-24 (3rd ed. 1939), states the rule to be as follows:

"§ 667. — *Severance of rights.*

"In most of the states in which the question has arisen, the owner of land bordering on the water has been regarded as entitled to sever

the right of reclamation and wharfing out from the land to which it originally appertained, so as to vest it in a person having no interest in such land. This he may do either by a transfer of the land retaining the right, or by a transfer of the right retaining the land. The effect of such a severance is obviously to subject the land to the possibility of losing its right of access by reason of the exercise of the right of reclamation."

See 56 Am. Jur. *Waters* § 253, p. 710 and § 288, p. 740; 93 C.J.S. *Waters* § 206, p. 1040; *Gould on Waters* (3rd ed. 1900) § 194, p. 324. See also *Thurston v. City of Portsmouth*, 205 Va. 909, 140 S.E.2d 678 (1965) and *Mianus Realty Co. v. Greenway*, 151 Conn. 128, 193 A. 2d 713 (1963).

The rule in England is apparently the same. Justice Storrs, for the Supreme Court of Errors of Connecticut, in *Simons v. French*, 25 Conn. 346, 352-53 (1856) indicates this. He stated:

"In Connecticut, it is now settled that the public, representing the former title of the king, is the owner in fee of such flats up to high water-mark, but that the owner of the upland adjoining such flats becomes entitled, by virtue of his ownership of the upland, to the exclusive right of wharfing out over them, in front of said upland, to the channel of an arm of the sea adjoining such flats. This right of wharfage— which, if in England it were vested in an individual, would be a franchise, being a royal privilege, or branch of the king's prerogative, subsisting in the hands of a subject—is with us, in the owner of the upland, a franchise, by the definition of that term as applicable here, and constitutes, like other franchises, a species of property, which, like other property, is alienable by the owner. We do not consider that such right of wharfage, or franchise, is an inseparable in-

cident or accessory to the upland, in such a sense that it inheres in, and is a part of, such upland itself, so as to be within the operation of the maxim, '*Accessorium non ducit sed sequitur suum principale*,' and so, therefore, that a grant of the upland necessarily conveys said franchise. It is true that such right of wharfage originates in, and is derived from, the ownership of the adjoining upland, and it was deemed by our courts to be attached thereto, undoubtedly from motives of general policy and convenience, and perhaps because in the early settlement of the state the establishment of such a principle would be an inducement to persons owning upland, to erect on the adjoining flats, wharves, and other conveniences for the accommodation of commerce, when the colony was unable to build them at its own expense. But this right, being once acquired by this, or whatever means, becomes in our view as separable from the ownership of the adjoining upland, and consequently as alienable by itself, as any other property, right, or franchise. And we can not perceive that a conveyance or reservation of it, by the owner of the upland, is not as valid as the conveyance of a similar right by the king in England to one of his subjects; nor why the exclusive right to erect wharves upon a piece of flats before it has been used for that purpose, is not as alienable by the owner of such right, as it would be after a wharf had been erected upon it; and in the latter case, there is no doubt that the wharf might be conveyed by itself, like other property, or if unconveyed by the owner in his lifetime, would descend to his heirs like other real estate."

See also *The Duke of Devonshire v. Pattinson*, L. R. 20 Q. B. Div. 263 (1887).

We conclude, as we have already stated, that, in our

opinion, the right to erect bulkheads to fill or wharf out and other riparian rights may be severed from the fast land and alienated like other rights of property.

### (2)

We will now consider the proper construction of the Boinis Deed, the provisions of which, as a recorded deed in the chain of title of the owner of Lots 270 through 276, are binding on the owner. Inasmuch as the Boinis Deed conveyed the seven lots by reference to a recorded plat—*i.e.*, the plat of Addition "A"—that plat became incorporated as part of the deed. *Whittington v. Mann,* 211 Md. 199, 126 A. 2d 617 (1956). In the event of ambiguity in the terms of the deed in regard to a description of a right of way, its location, as shown on the plat will prevail. *Whittington v. Mann, supra.*

The appellants contend that the provisions of the Boinis Deed and plat make it clear that they have the right to "enjoy the use of adjacent waters of Isle of Wight Bay" and that the action of Skyline and Bay Shore in bulkheading and filling to the north of the seven lots is in violation of that right.

In our opinion, however, reading the provisions of the deed and the plat together, and with the attendant circumstances at the date of the execution of the deed, the intention of the parties clearly and unambiguously appears to the contrary. We have already set out the relevant provisions of the Boinis Deed in full and we need not set them out again. The deed denies to Boinis, the grantee, his heirs and assigns, the "right to extend said lots beyond their present lines * * * in any manner whatsoever." It reserves to Skyline "all lands * * * adjacent to said lots which lie beneath the waters of Isle of Wight Bay" and provides that the grantee, Boinis, his heirs and assigns shall "enjoy the use of adjacent waters of Isle of Wight Bay except on the easterly side of Lot No. 276 if the grantor herein decides to reclaim the same * * *." There is also a limitation in the deed of the right of Boinis to construct "a wharf or dock, not to exceed

three (3) feet in width, from said lots into the waters of Isle of Wight Bay for a distance not exceeding twenty-eight (28) feet." The recorded plat, as we have noted, has the notation "(future extension)" to the north of Lot No. 225 and Bay Shore Drive with extending "hash" lines into the Bay. The same notation appears to the east of Lot No. 276 off Eagle Drive, with a "hash" line from the northeast corner of Lot No. 276 into the Bay area shown on the plat.

It is clear that Boinis did not acquire all the rights incident to waterfront land. By the deed and plat, he did not acquire the right to natural accretion or the right to enlarge the land by artificial landfills. His right to construct "improvements" was limited to a wharf or dock not more than three feet wide or 28 feet in length, which, with the plat, limits his right to "enjoy the use of adjacent waters," indicating that he, his heirs and assigns, were to have only a reasonable right of access from the northerly lines of the lots to the Bay, subject to the specific limitations in regard to a wharf or dock.

Although a conveyance of land bordering on navigable water presumptively carries with it the grantor's riparian rights, including the right to erect bulkheads, to fill and to wharf out, this presumption may be rebutted. 2 Tiffany, *The Law of Real Property*, § 667, pp. 723, 724 (3rd ed. 1939). See *Owen v. Hubbard*, 260 Md. 146, 151-52, 271 A. 2d 672, 676 (1970). In the present case, the Boinis Deed and plat have successfully rebutted that presumption.

If it be thought that the provisions of the Boinis Deed and plat are ambiguous in regard to the restricted nature of the grant of riparian rights (and in our opinion, there is no ambiguity), the extrinsic evidence introduced into evidence in the trial court leaves little doubt that the grantor and grantee in that deed intended that Boinis, his heirs and assigns, were to be granted only a right to have access to the waters of the Bay, subject to the right of Skyline to make further land fills to the north of the seven lots so long as that access was not im-

paired. Jenkins testified that when he discussed the purchase of the seven lots with Boinis, "At that time Mr. Boinis was informed that [there] would be lagoon-front lots as future developments took place. He was shown a Master Plan of the entire development between 26th and 32nd Street." This Master Plan was the plat marked Defendants' Exhibit No. 2. Boinis confirms the Jenkins testimony and stated that he had seen a map in Mr. Bounds' office similar to the Master Plan (Defendants' Exhibit No. 2), on that it showed "a configuration that looks like what is labeled here E, B and D."

Marcus J. Williams, a member of the Bar practicing law in the northern end of Worcester County, including Ocean City, and who, at the time of trial, had been City Solicitor for Ocean City for some 18 years, recalled preparing the Boinis Deed for Boinis. In the course of his discussions with Boinis, it was his recollection that the Master Plan or one very similar to it was spread on the floor in the room he was then occupying as a part-time office in the Bounds Building. He pointed out to Boinis exactly what he was getting if he bought the property. This was before Boinis had signed the contract of sale. In his opinion, Boinis was aware of what he bought. There is little doubt that the parties to the Boinis Deed by using the language denying Boinis the "right to extend said lots beyond the present lines" and by reserving "all lands * * * adjacent to said lots which lie beneath the waters of Isle of Wight Bay," intended to retain for Skyline the right under Art. 54, §§ 45 and 46 to construct artificial land fill in the navigable waters to the north of the seven lots; but to provide Boinis, his heirs and assigns, however, with the right to navigate from those lots, the deed provided that the grantee should "enjoy the use of adjacent waters of the Isle of Wight Bay" and to construct a "wharf or dock" of limited size. Judge Travers, in our opinion, was correct in holding it was the intention of the parties to the Boinis Deed that: "Skyline was to grant the lots to Boinis with access to the Bay but was not relinquishing its right to complete

its Master Plan of development which included the construction of Additions E and C."

## (3)

The appellants vigorously contend that, in any event, the trial court erred in holding that they had sufficient notice of the contemplated land fill to the north of the seven lots so as to preclude them from the relief sought in the suit. Again, we do not agree with this contention.

If it be assumed for the argument that the provisions of the Boinis Deed and the Plat to Addition "A," as a part of that deed, are ambiguous so that the appellants would not be charged with notice of the intention of the parties as determined by construction of that Deed by the Court unless they had either actual or constructive notice of such an intention, then (except possibly, from Elharts, Inc. through its President Strahle), there is no evidence that the other appellants had actual notice of the agreement reached between Skyline and Boinis in which it was intended that Skyline should have the right to conduct additional dredging and filling to the north of the seven lots. As to such other appellants, the notice necessarily must be constructive. Judge Delaplaine, for the Court, in *Blondell v. Turover,* 195 Md. 251, 257, 72 A. 2d 697, 699 (1950), aptly stated:

> "* * * In determining whether a purchaser had notice of any prior equities or unrecorded interests, so as to preclude him from being entitled to protection as a *bona fide* purchaser, the rule is that if he had knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry, he will be presumed to have made such inquiry and will be charged with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued. *Baynard v. Norris,* 5 Gill 468, 483, 46 Am. Dec. 647; *Higgins v. Lodge,* 68 Md. 229, 235, 11 A. 846, 6 Am. St. Rep. 437. In other words, a purchaser

cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him; and if he neglects to make such inquiry, he will be held guilty of bad faith and must suffer from his neglect * * *."

The general rule is in accord. See 55 Am. Jur. *Vendor and Purchaser* § 697, pp. 1075-77.

Our predecessors have decided in regard to what facts are sufficient to excite inquiry, the test being the "notice of facts which would lead an ordinarily prudent man to make an examination," *Hunter v. Baker,* 154 Md. 307, 331, 141 A. 368, 377 (1928). If such an examination were made and would disclose the existence of additional facts, then there is sufficient notice of those additional facts. *Hunter v. Baker, supra.* In our opinion, the decision in *Irvington Federal Savings & Loan Association v. West,* 194 Md. 211, 71 A. 2d 1 (1950), when carefully read, does not indicate a different test.

It is also well settled in Maryland that a title examiner is charged with notice of whatever appears in the Land Records in the chain of title to the property involved, *Williams v. Banks,* 11 Md. 198, 250 (1857)—See *Klein v. Dove,* 205 Md. 285, 107 A. 2d 82 (1954)—and that notice to an attorney is notice to his client, *Miller v. Mitnick,* 163 Md. 113, 118, 161 A. 157, 159 (1932).

A proper title examination by the attorneys for Elharts, Inc. or for the individual owners of the condominium would have disclosed the intention of Skyline to make the land fill of which the complaint is made. A proper investigation of the chain of title would have disclosed the progressive filling of the area between North 26th and North 32nd Streets. This disclosure would have occurred (1) from a comparison of the deeds to Bay Shore in 1957 and 1959 with the first subdivision plat of Bay Shore Estates recorded on April 11, 1961; (2) from a comparison of the 1961 Plat of Bay Shore Estates and the 1966 Deed from Bay Shore to Skyline with the

plat of Addition "A" to Bay Shore recorded on September 1, 1966; and, (3) from the recital in the "being clause" of the Deed from Skyline to Boinis that the lands conveyed were "a *part* of all and the same property, *with natural and artificial accretions thereto,* which was conveyed to the grantor herein [Skyline] from Bay Shore Development Corporation. . ." (Emphasis added).

As we have already observed, the Skyline-Boinis Deed, in the chain of title, contains an express denial to Boinis, the grantee, his heirs and assigns, to extend the seven lots into the water by artificial accretions, Skyline's reservation to it of the lands under water adjacent to those lots, and a limitation upon the length of wharfs and piers Boinis, his heirs and assigns, could build out into the water.

The chain of title also included the plat of Addition "A" to which the Skyline-Boinis Deed made express reference in describing the seven lots conveyed. This plat, as we have stated, had the legends, "(future extension)" in the areas east and west of the seven lots conveyed and showed Bay Shore Drive terminating in the water in one of the areas designated for "future extension." There is no dispute in regard to the meaning of these legends, the testimony of Mr. Cropper, the surveyor and civil engineer, that they mean an area which had not been "completely developed" and that such legends are the "conventional or accepted method of showing future developments on * * * plats," being uncontradicted.

The plat for Addition "A" also indicated a line marked "Bulkhead Limit Line as established by the Worcester County Shoreline Commission." This bulkhead limit line was established, after public hearings, by the Act of 1965, Ch. 757, as amended by the Act of 1968, Ch. 405 as set forth on a plat entitled "Bulkhead and Borrow Area Limit Lines" duly recorded on October 28, 1965. This plat shows the area between North 26th Street and North 32nd Street, where Bay Shore Estates is located as extending for a much greater distance than elsewhere along the Bay side of Ocean City, thus forming a distinct

"bulge." When the appellants acquired their property, this "bulge" in the bulkhead line had been only partially filled by the construction of Additions "B" and "D" and the only area not filled was in the direction indicated by the legends "future extension" on the plat for Addition "A."

The chain of title also included the 1966 deed from the Board of Public Works conveying the land under water between North 26th and North 28th Streets to the Mayor and City Council of Ocean City which recited, in part, that:

> "WHEREAS, the municipality of Ocean City has, since its enactment of 1946, had a comprehensive zoning ordinance and other ordinances regulating subdivisions, platting of properties, dedication of streets and other public easements; and
>
> "WHEREAS, the area between North 26th and North 32nd Streets, hereinafter described, *is now being extensively developed by the owners thereof* and the Mayor and City Council of Ocean City, a body corporate as aforesaid, have requested this deed in order to be able to more efficiently enforce dredging and filling operations within the corporate limits of said town."
> (Emphasis added.)

The Mayor and City Council of Ocean City on the same day, October 31, 1966, deeded its interest to Skyline of that portion of the bottom of the Bay now occupied by Addition "A."

In our opinion, all of these instruments of record and in the chain of title were sufficient notice of facts which would lead an "ordinarily prudent man" to make an inquiry in regard to what additional filling was contemplated to the north of the seven lots. This is confirmed by the testimony of Adrian H. Williams, Anthony Calapristi, and Donald W. Marks that had they seen the recorded plat of Addition "A" with the legends "future

extension", they would have investigated to discover what was involved in future extensions. Arthur King also testified to substantially the same effect. If an inquiry had been made to discover what future extensions were contemplated, there were many persons readily available to whom such an inquiry might well have logically been directed, including Jenkins, Cropper, Bounds, Marcus Williams, the Army Engineers, and the Mayor and City Council of Ocean City. The appellants are thus charged with notice of the facts such an inquiry would have disclosed and they are not bona fide purchasers of the seven lots or of the condominium units on those lots, without notice of the contemplated filling operations to the north of those seven lots.

A case rather closely in point on the question of constructive notice is *Simpson v. Campbell,* 391 P. 2d 245 (Okla. 1964). In *Simpson* there were two plats involved showing the area in question—one, an earlier unrecorded plat, showing the area as a part of a residential subdivision and the other, a later recorded plat, showing the area as "not included" in the subdivision. The deeds of the plaintiffs in *Simpson,* by which they had acquired lots in other parts of the subdivision from the developer's successor-in-interest, claimed that they had relied (1) upon statements made by their builder-vendor, (2) the unrecorded plat, or (3) visual inspection of the area in question. The builder who had conveyed the lots to them had not informed them that the developer had told him that the area in question was no longer a part of the subdivision. When the developer sought to use the area in question for commercial purposes, they sought to prevent such a use by seeking an injunction against the developer. In holding that the developer could carry out his plans for commercial development, Chief Justice Blackbird for the Supreme Court of Oklahoma stated for that court, in regard to the recorded plat:

"* * * [W]e cannot escape from the conclusion that its recording was sufficient to provoke inquiry as to the true situation concerning said

Tract, and to prevent plaintiff and others similarly situated (who apparently neither for themselves, nor by any agent or attorney, made any such inquiry before later acquiring title by deeds specifically referring to said public record) from successfully, and in good faith, contending that they had purchased in reliance on some contradictory and less relevant representation. * * * They are presumed to have known that the records in the County Clerk's office, are the prime, or first, source of authentic information concerning plats and plat restrictions. * * *"
(391 P. 2d at 252.)

*Ruling in Regard to Addition "C"*

As we have indicated, Judge Travers, although by no means sure that the question was properly before him, declined to grant the appellants the relief sought by them in their "Second" petition seeking injunctive relief against the erection of bulkheads and filling of Addition "C." He was of the opinion, however, that in view of the importance of the case to the parties and to the contract purchasers of the land created, as well as the expense and duplication that a hearing *de novo* in regard to Addition "C" would entail, he should decide those issues in the present case. He ruled against the three contentions of the petitioners in the "Second" petition and, as we have already stated, dismissed the "Second" petition with prejudice.

The appellants first contended before Judge Travers that "no one had the right to fill in state waters." We have already disposed of this contention under part (1) of this opinion by indicating that Skyline when it did so did have a right to fill under the Act of 1862 and various conveyances.

The second contention before the lower court was that the filling by the appellees was in violation of the covenants and rights granted to the appellants under the Skyline-Boinis Deed. Here again, we have decided this

issue against the appellants under part (2) of this opinion. In addition to what we said there, the petitioners in their "Second" petition did not allege and made no attempt to prove that the lands to which Addition "C" attach are owned by Skyline and would be subject to the provisions of the Skyline-Boinis Deed, in any event. Indeed, the record indicated the contrary, *i.e.*, that Skyline owned the fast land no farther north than North 28th Street and that Bay Shore owned all of the waterfront land between North 28th and North 32nd Streets. Nor did the petitioners in the "Second" petition show that the Skyline-Boinis Deed was in the chain of title to the Addition "C" property so that even if the Skyline-Boinis Deed had the effect contended for by the petitioners, it could not affect or bind land owned by another corporation through an independent chain of title.

The third contention before Judge Travers in regard to the "Second" petition was that no permit had been issued by the Worcester County Shoreline Commission as allegedly required by §§ 15A and 15B of the Public Local Laws of Worcester County. The testimony, however, indicated that when either Bay Shore or Skyline applied to that Commission for a permit, the Commission ruled that no such permit was required, apparently because the permits from the Army Engineer predated the establishment of the Commission and the Commission had adopted the bulkhead limit line, which it administers, to coincide precisely with the work authorized by the permit from the Army Engineers. In addition to this, the Commission was advised by its counsel that the plat requirements of § 15A were illegal and hence the apparent requirement of recording a plat in advance of actual construction was excused. This was the general policy of the Commission. Judge Travers did not pass upon the correctness of the procedures of the Commission, but confined his ruling on this point, to a ruling that the petitioners could not divest either Skyline or Bay Shore of valuable property rights by mounting a collateral attack on the procedures of the Commission and

when no fraud or bad faith is suggested on the part of the Commission when the Commission was not even a party to the suit. In our opinion, this ruling by the trial court was correct. See *Taylor v. Ramsay Co.,* 139 Md. 113, 114 A. 830 (1921) ; 73 C.J.S. *Public Administrative Bodies and Procedure,* § 146, pp. 479-80.

For all of these reasons, we affirm the order of August 16, 1971, dismissing with prejudice the "First" and "Second" petitions.

*Order of August 16, 1971, affirmed, the appellants to pay the costs.*

172