The WASHINGTON POST COMPANY,
Appellant/Cross Appellee,

v.

CLAY PROPERTIES, INC., et al.,
Appellees/Cross Appellants.

Nos. 88–258, 88–963.

District of Columbia Court of Appeals.

Argued Nov. 28, 1989.
Decided April 25, 1990.

Jack McKay, with whom Christine M. Nicolaides, Washington, D.C., was on the brief, for the Washington Post.

William H. Jeffress, with whom Joe R. Caldwell, Jr. and Louis Rabil, Washington, D.C., were on the brief, for Clay Properties, Inc., et al.

Before FERREN and STEADMAN, Associate Judges, and MACK, Senior Judge.

STEADMAN, Associate Judge:

These consolidated appeals involve two episodes in a protracted legal battle between the Washington Post Company ("the Post") on the one hand, and Ozzie Clay ("Clay") and Clay Properties Incorporated ("CPI") on the other, over ownership and control of a commercial building at 1523 L Street, N.W. ("the building"). In No. 88–963, CPI appeals from a grant of summary judgment in favor of the Post; CPI contends that the trial judge applied an erroneous standard of law in concluding that the Post, when it purchased the building at foreclosure, did not have notice of a lease between CPI and Clay which CPI now wishes to enforce against the Post. The Post is appellant in No. 88–258; it contends that the trial court improperly granted CPI's motion to voluntarily dismiss another lawsuit against the Post involving many of the issues presented in the case in which summary judgment was entered. We reverse the grant of summary judgment in No. 88–963 and affirm the grant of voluntary dismissal in No. 88–258.

I

Clay purchased the building in 1979, and title was in his name.[1] In 1981, Clay and members of his family formed CPI to develop and operate commercial properties. On January 12, 1982, Clay, as owner of the building, and CPI, as lessee, executed a lease agreement ("Master Lease" or "Lease") which now lies at the center of this dispute. The Lease, which covered the entire building, contained a number of unusual provisions. Altbough the Lease was for a term of a year, it included 98 one-year options to renew which would take effect automatically unless CPI notified the landlord. For the period from 1982–1986, the Lease required CPI to pay rent of $500 per month for a building with rental market value of as much as $50,000 per month.[2] The Lease effectively gave CPI complete control of the building; CPI had full power to make alterations to the building or even to demolish and rebuild it. More importantly, the Lease entitled CPI to sublet any part of the building, designating itself as landlord, and to collect all rents.[3] Finally, the Lease provided that it would not be subordinate to any mortgage or lien placed on the property after execution of the Lease.

---

1. Dealing with a motion for summary judgment, we present the facts in the light most favorable to CPI, the non-movant. *Bell v. Jones,* 566 A.2d 1059, 1061 (D.C.1989).

2. The Master Lease did provide for rent increases every four years for the first 29 years. Even by the year 2011, however, the Lease required CPI to pay monthly rent of only $1,000.

 There is sharp disagreement among the parties about whether the Lease required CPI to pay the building's operating expenses, which exceeded $300,000 per year in 1987. In its opposition to the Post's summary judgment motion, and in support of its argument that the terms of the Master Lease are reasonable, CPI asserts that the Lease required CPI to pay Clay or any subsequent owners of the building all operating expenses and taxes on the building. In its reply, the Post claims that the Lease imposed on CPI no obligation to pay building expenses, and that any terms of the Lease which might arguably require CPI to pay expenses pertained only so long as Clay himself owned the building. The Post notes that Clay himself testified at a preliminary injunction hearing that CPI was not required to pay building expenses once Clay ceased to own the building.

3. The Master Lease also gave CPI an option to purchase the building at any time for $1.5 million. Moreover, in the event the landlord breached the Lease, CPI was entitled to receive $17 million in liquidated damages.

In November of 1984, to partially secure a commercial loan to finance business ventures unrelated to the building, Clay granted a second deed of trust on the building to First American Bank.[4] In the event of default, the Master Lease was assigned to First American, but it was not subordinated to this deed of trust. In early 1987, First American foreclosed on the building and sold its interest to the Washington Post. The Post closed on its purchase on March 31, 1987. When the Post took over the building, Clay, CPI, and Clay & Company[5] occupied two suites on the first floor of the building. On April 9, 1987, the Post gave Clay and his companies notice to vacate the space occupied by them within thirty days.

Since that time, the Post on one side and Clay and CPI on the other have been embroiled in litigation. On April 13, 1987, Clay, who was the defendant in a case filed by First American Bank in federal court in Virginia on the note for which Clay had given a second deed of trust on the building, filed a third-party complaint against the Post. The complaint, which named the Post as purchaser of the building, alleged wrongful foreclosure. The trial judge in the federal litigation dismissed the complaint against the Post; the net result of this litigation was to settle in the Post's favor the question of who had the underlying fee title to the building.

On May 20, 1987, the Post filed a landlord-tenant action against Clay, seeking to evict Clay and his companies from the office space they occupied in the building.[6] In June, Judge Richter entered an interim protective order requiring Clay and his companies to make monthly rent payments to the Post. In his answer to the Post's Landlord–Tenant complaint, Clay asserted CPI's rights to the building under the Master Lease.

On October 30, 1987, after tensions over control of the building escalated, and CPI began demanding that the building's tenants pay rent to CPI, the Post filed a civil action seeking to enjoin CPI from exercising any purported landlord rights in the building. A lengthy preliminary injunction hearing, at which one of the issues was the validity of the Master Lease, was held before Judge Tignor. Much of the evidence and testimony adduced at that trial became part of the record in the summary judgment motion in the Post's landlord-tenant case. At the time the Post's motion for summary judgment was entered, Judge Tignor had not yet ruled in the Post's civil case, and the case has been stayed pending this appeal.

On December 17, 1987, before the outset of the preliminary injunction hearing in the Post's civil case, CPI filed a landlord-tenant action seeking to evict the Post from the building.[7] CPI also filed suits for possession against other tenants in the building. In all these cases, CPI asserted the authority to evict under the terms of the Master Lease. CPI's eviction suit against the Post was scheduled for trial beginning March 10, 1988. On February 26, 1988, CPI filed a motion to stay its eviction case pending resolution of the lawsuits initially filed by the Post. CPI also requested a jury trial in its action. Judge Dixon denied CPI's motion on March 4, 1988. Additionally, he denied CPI's request for a jury trial on the grounds that CPI had not made a jury trial demand within the time period prescribed in the Superior Court Landlord–Tenant rules. On March 7, CPI filed a motion for reconsideration or in the alternative a voluntary dismissal of its suit without prejudice. Judge Dixon refused to vacate any part of his March 4 order, but, over the Post's opposition, granted CPI's motion for voluntary dismissal without prejudice. The Washington Post appealed from Judge Dix-

---

4. Clay had granted a first deed of trust to another bank in September 1984.

5. Clay & Company is another business entity owned by Clay.

6. It is from that case that appeal No. 88–963, involving the grant of summary judgment for the Washington Post, arises.

7. It is from that case that appeal No. 88–258, involving the issue of CPI's voluntary dismissal of its lawsuit, arises.

on's order granting the voluntary dismissal.

Following the voluntary dismissal of CPI's action, the Post filed a motion for summary judgment in its landlord-tenant suit against CPI. On June 30, 1988, Judge Goodrich entered an opinion and order granting summary judgment on the ground that the Master Lease, which was unrecorded, was unenforceable against the Post. Judge Goodrich's ruling rested on the determination that the Post was a bona fide purchaser without notice. CPI appealed from the grant of summary judgment in favor of the Post.

II

 Under D.C.Code § 45–801 (1986), a deed conveying an interest in real property is not effective against "subsequent bona fide purchasers" of the deed unless it is recorded.[8] A bona fide purchaser is one "who acquires an interest in property for a valuable consideration and without notice of any outstanding claims which are held against the property by third parties." 6A R. POWELL & P. ROHAN, THE LAW OF REAL PROPERTY ¶ 904[2][b], at 82–10 (rev. ed. 1989) [hereinafter R. POWELL, REAL PROPERTY]. Because the Master Lease at issue in this case was not recorded, it is not effective against the Post if the Post was a bona fide purchaser. To determine whether the Post was a bona fide purchaser, Judge Goodrich had to decide whether the Post had notice of the Master Lease.[9] In holding that it did not, Judge Goodrich reasoned in critical part as follows:

8. D.C.Code § 45–801 provides:
 Any deed conveying real property in the District, or interest therein, or declaring or limiting any use or trust thereof, executed and acknowledged and certified as provided in §§ 45–306, 45–502, 45–601 to 45–604 and delivered to the person in whose favor the same is executed, shall be held to take effect from the date of the delivery thereof, except that as to creditors and subsequent bona fide purchasers and mortgagees without notice of said deed, and others interested in said property, it shall only take effect from the time of its delivery to the Recorder of Deeds for record. As we use the phrase "bona fide purchaser" in this opinion, it incorporates the notion of an absence of notice of the unrecorded instrument.

The Court agrees with defendants [Clay and CPI] that there were a number of occasions when plaintiff [the Post] had the opportunity to learn of the master lease. However, the Court does not feel that an awareness of the existence of the master lease was sufficient to place plaintiff on notice of the actual terms of the lease. The lease that plaintiff signed with CPI did not mention the master lease that CPI had with Mr. Clay and certainly did not inform plaintiff that CPI's master lease included ninety-eight annual options for renewal. Plaintiff searched title of the building prior to the foreclosure sale and again prior to closing. Since the master lease was unrecorded, plaintiff found nothing. Consequently, plaintiff could not have known that the master lease was still in existence. Plaintiff made a proper title search pursuant to D.C.Code § 45–801. The Code does not require purchasers to perform any other investigations even if they have a suspicion of a long term lease. If defendants desire the protection of the recordation statute, they should have complied with its requirements and recorded their master lease where plaintiff could have reviewed it and its terms. As a result of the foregoing facts, the Court deems plaintiff a "bona fide purchaser without notice."

We hold that Judge Goodrich misapprehended, and accordingly misapplied, the applicable law. *See Davis v. United States,* 564 A.2d 31, 36 (D.C.1989) (en banc) (some appellate courts apply "de novo" review of

Because the District's statute of frauds states that leases for more than one year cannot be created "except by deed," D.C.Code § 45–306 (1986), such leases must be recorded to be valid as against a subsequent bona fide purchaser. The parties here agree that the Master Lease, which was for one year but included 98 one-year renewal options, falls within the provisions of § 45–801 and would not be valid as against a subsequent bona fide purchaser.

9. It is undisputed that the Post paid valuable consideration for the building at the foreclosure sale.

legal issues in mixed questions of fact and law).

There is no significant dispute that the Post was unaware of the exact terms of the Master Lease at the time of closing. As such, the Post did not have actual notice of CPI's interest in the building. Notice, however, may be actual, constructive, or inquiry. 6A R. POWELL, REAL PROPERTY, *supra,* ¶ 904[2][b], at 82–11.[10] Thus, even where a buyer does not have actual notice of a prior interest, the law may nevertheless charge him or her with notice. In this case, the issue is whether the Post was on inquiry notice of the Master Lease and its terms.

■ A purchaser is held to be on inquiry notice where he or she is aware of circumstances which generate enough uncertainty about the state of title that a person of ordinary prudence would inquire further about those circumstances. The purchaser is on inquiry notice of all facts and outstanding interests which a reasonable inquiry would have revealed. 6A R. POWELL, REAL PROPERTY, *supra,* ¶ 905[1][d][iv], at 82–57. *See, e.g., Rosenthal v. J. Leo Kolb, Inc.,* 97 A.2d 925, 927 (D.C.1953) (" '[t]he knowledge of facts or circumstances reasonably sufficient to put a person of ordinary prudence upon inquiry which, if pursued with proper diligence, would lead to the discovery of the actual condition of the

title, is equivalent to knowledge direct and certain' ") (citation omitted); *Williams v. Skyline Dev. Corp.,* 265 Md. 130, 164, 288 A.2d 333, 353 (1972) (if the purchaser " 'had knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry, he will be presumed to have made such inquiry and will be charged with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued' ") (citation omitted).

■ CPI here alleges that several facts were sufficient to put the Post on inquiry notice of the Master Lease. First, and most importantly, CPI points out that in February 1986, the Post, which already occupied another structure adjacent to the building, entered into a three-year lease with CPI for two floors in the building. The lease identified and was executed by CPI as lessor. Second, CPI asserts that the Post at least suspected that CPI was also the lessor to all the other tenants in the building.[11] Third, CPI argues that its own occupancy of two offices in the building was sufficient to put the Post on notice that CPI was a tenant operating under some type of lease from the record title holder.[12] CPI contends that these facts were sufficient to induce an ordinarily prudent purchaser to inquire further about CPI's interest in the building, and that a

---

**10.** Strictly speaking, inquiry notice is itself a variety of constructive notice. However, because constructive notice "by more or less common acceptance ... has come to mean record notice," 6A R. POWELL, REAL PROPERTY, *supra,* ¶ 905[1], at 82–48, it is useful to treat inquiry notice as a distinct category of notice.

**11.** In February 1987, as the Post prepared to purchase the building, one of Clay's agents compiled for an agent of the Post a list of the leases in effect for the building's tenants. This compilation of leases indicated that CPI was the lessor to every tenant in the building. The compilation did not, however, include the Master Lease between Clay and CPI.

According to Judge Goodrich's order, it was undisputed that the Post's agent did not review this compilation list. CPI claims that prior to closing, however, the Post did suspect that other tenants in the building had leases with CPI as lessor. When asked if he knew on March 31, 1987 (the day of the closing) "that all of the

tenants in the building had some sort of lease agreement prior to that time with Clay Properties, Incorporated," a representative of the Post testified: "Well, we assume they did since they were tenants in the building." After closing, the Post assertedly confirmed this suspicion by independently compiling information about the leases in effect in the building from the building's tenants themselves.

**12.** Presumably, CPI's right to possess the two suites arose from the terms of the Master Lease itself. However, the record reflects sharp disagreement about whether the Post in fact requested to see copies of all leases in effect in the building, which would have included the Master Lease. There is also disagreement about whether Clay and his agents concealed the Master Lease from the Post when the Post attempted to learn about the leases in effect in the building. Because these questions involve considerable genuine issues of material fact, they are inappropriate for summary judgment. Super.Ct. Civ.R. 56(c) (1989).

reasonable inquiry would have led the Post to discover both the existence and the terms of the Master Lease.[13]

In light of the principles of inquiry notice set forth above and the facts alleged by CPI, which for purposes of summary judgment must be taken as true, it was erroneous to conclude as a matter of law that the Post had no duty to inquire further into the true nature of CPI's apparent interest. The Post, because its own lease was with CPI, presumably knew that CPI had the power to lease space in the building. At the same time, the Post knew that Clay, not CPI, was the record title holder. Where a party other than the owner of property has authority to lease that property, it indicates that the lessor may have some interest in the property inconsistent with record title. Because the possibility of such an interest " 'is inconsistent with a perfect right in him who proposes to sell,' " *Hayward v. Mayse*, 1 App.D.C. 133, 140 (1893),[14] a buyer of ordinary prudence might inquire further to determine the nature of that interest. Contrary to the trial court's apparent conclusion, a purchaser whose "suspicion" of an interest is generated by facts which would raise in a purchaser of ordinary prudence doubts about the condition of title is required to inquire about the existence of unrecorded interests.

The Post's contrary assertion that "mere knowledge by the purchaser that a lease exists is insufficient to constitute notice of its 'unusual' provisions" is simply wrong, as the previous discussion indicates. The Post's reliance on *Rogers v. Rawlings*, 54 App.D.C. 361, 298 F. 683 (1924), in support of its position is misplaced. *Rogers* involved a contract for the sale of rental property under which the seller promised delivery of "good record title" in exchange for the buyer's assumption of an existing deed° of trust. After a title search, but before closing, the buyer discovered that the deed of trust authorized the mortgage holder to collect all rents from the property until the deed of trust was fully paid. In ruling that the buyer was not obligated to perform, the court indicated that the seller had not delivered "good record title," as called for in the contract. The court stated:

> *At that stage of the transaction* [the buyer] had a right to assume that the provisions of the deed of trust were not materially different from the usual and ordinary provisions of such instruments.... The purchaser had a right to expect that good record title meant title subject only to a deed of trust for $30,-000 with the usual provisions.

54 App.D.C. at 363, 298 F. at 685 (emphasis supplied). The *Rogers* opinion thus does

---

**13.** CPI also argues that an employee of First American Bank knew about the Master Lease and implies that such knowledge should be imputed to the Post. However, neither the knowledge of a deed of trust holder nor that of the grantor at a foreclosure sale is automatically imputed to the purchaser. This flows from the rule that a purchaser without notice who takes from a party with knowledge of an unrecorded interest may nevertheless be deemed a protected bona fide purchaser. G. THOMPSON & J. GRIMES, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY § 4314, at 375 (1963); *Palamarg Realty Co. v. Rehac*, 80 N.J. 446, 457 n. 6, 404 A.2d 21, 27 n. 6 (1979).

**14.** Elsewhere, the *Hayward* case states: " 'When possession is relied on as giving constructive notice, it must be open and unambiguous, and not liable to be misunderstood or misconstrued. It *must be sufficiently distinct and unequivocal, so as to put the purchaser on his guard.'* " *Hayward, supra*, 1 App.D.C. at 140. The Post relies on this passage in arguing that it was not on

inquiry notice of CPI's leasehold interest because CPI's possession was not "distinct and unequivocal." As the quoted passage from *Hayward* makes clear, however, this requirement applies in cases where the holder of an unrecorded interest asserts that his or her physical *possession* constituted notice of his or her interest in the property. Courts developed the "distinct and unequivocal" requirement largely to deal with situations where, after a purchaser bought from one member of a family living on a parcel of land, another family member also living on the parcel asserted an unrecorded interest. *See, e.g., Kirby v. Tallmadge*, 160 U.S. 379, 383–89, 16 S.Ct. 349, 350–53, 40 L.Ed. 463 (1896), and cases cited therein.

In this case, however, it is CPI's authority to lease space in the building, not its possession of two suites, which could have caused an ordinarily prudent purchaser to inquire about CPI's interest. As such, the "distinct and unequivocal" requirement from physical possession cases does not apply.

not suggest that a buyer who knows of the existence of an encumbrance at the time of closing need not inquire as to the unusual conditions of the encumbrance. To the contrary, the *Rogers* court excused the buyer from his contractual obligation to perform precisely because he did inquire about the terms of the deed of trust prior to closing.[15]

This is hardly to say that a holder of an unrecorded interest may rest confident of his position. A purchaser who conducts a proper title search, as the Post did here, is fully protected against all unrecorded interests falling within the recording statute, with the exception of any as to which the purchaser has actual or inquiry notice. But contrary to the suggestion of the trial court, a title search alone cannot completely exonerate a purchaser; the doctrine of inquiry notice may require more. The integrity of the recording system dictates that such inquiry notice should not be too readily imputed, but the facts here cannot be deemed, as a matter of law, insufficient to have imposed on the Post a duty to inquire.

The fact that a purchaser of ordinary prudence might have inquired about CPI's interest in the property, however, does not establish for purposes of summary judgment that the Post was *not* a bona fide purchaser. The record reveals sharp dispute about what any inquiry by the Post would have revealed. *See supra* note 12. This dispute is an issue to be resolved at trial by the finder of facts. Additionally, the Post has raised a number of other objections to the Master Lease, including fraud, abandonment, and unconscionability, which might also preclude its enforcement against the Post. We therefore reject CPI's request that we direct the trial court to enter summary judgment for CPI declaring that the Post was not a bona fide purchaser.

## III

Originally, CPI's landlord-tenant action seeking to evict the Post from the two floors it was leasing in the building was scheduled for trial on March 10, 1987. This was considerably before the Post's earlier-filed landlord-tenant action—in which Judge Goodrich ultimately entered summary judgment in the Post's favor—was set for trial. On February 26, 1987, CPI sought a stay of its landlord-tenant case pending the outcome of the preliminary injunction action which had already been tried before Judge Tignor or the Post's earlier landlord-tenant action. In the alternative, CPI sought a continuance because its lead counsel was suffering from physical ailments. Judge Dixon denied the motion in all respects. On Monday, March 7, CPI filed a motion to reconsider or, in the alternative, for voluntary dismissal of its case. CPI based its March 7 motion on substantially the same grounds it had advanced for the March 4 motion. Judge Dixon denied the motion to reconsider but granted the motion to dismiss without prejudice.[16] The Post contends that the order

---

**15.** The Post also cites several cases from other jurisdictions in support of its claim that knowledge of the existence of a lease does not charge a buyer with notice of its unusual terms. In those cases, however, the issue of inquiry notice was not relevant because of the peculiarities of state law. *Mister Donut of America, Inc. v. Kemp,* 368 Mass. 220, 330 N.E.2d 810 (1975), and *South Street Inn v. Muehsam,* 323 Mass. 310, 81 N.E.2d 821 (1948), both construe a Massachusetts statute which provides that if a lease of more than seven years is not recorded, subsequent purchasers are protected unless they have *actual* notice. In both cases, however, knowledge of a lease would have provided inquiry notice of the lease's terms. *Mister Donut, supra,* 368 Mass. at 222, 330 N.E.2d at 812; *South Street Inn, supra,* 323 Mass. at 312, 81 N.E.2d at 823. In *Knowles v. Wholesale Electronic Sup-*

*ply, Inc.,* 388 So.2d 426 (La.Ct.App.1980), the court ruled that notice of a lease did not bind a subsequent purchaser unless the lease was recorded. Apparently, under Louisiana law, if a lease is not recorded, a subsequent purchaser takes subject to the lease only if he or she *intends* to be bound by the provisions of the lease. *Id.* at 427. Neither the Massachusetts statute nor the Louisiana doctrine is the law in the District of Columbia.

**16.** To insure that the Post did not suffer undue prejudice as a result of the dismissal, the trial judge granted the motion to dismiss subject to several conditions. First, the court required CPI to pay all of the costs incurred by the Post in the case which CPI sought to dismiss. Second, the court prohibited CPI from re-filing its

granting voluntary dismissal should be reversed because it received inadequate notice of CPI's March 7 motion. It also asserts that notwithstanding the notice issue, the trial judge erred in granting the motion to dismiss. We conclude that the Post's contentions do not merit relief.

The Post first argues that the trial court should not even have considered the March 7 motion because the Post had inadequate notice of the motion. The Post states that according to the Superior Court Landlord and Tenant Rules, a motion "shall be heard not earlier than the 5th day after service of the motion, whether served by hand or by mail." Super.Ct. L & T R. 13(c) (1989). Rule 13(c), however, applies only to motions described in Rule 13(a), namely, motions "dependent upon facts not apparent upon the record." Super.Ct. L & T R. 13(a) (1989). *See also Battle v. Nash*, 470 A.2d 1252, 1254 (D.C.1983) (construing Rule 13(c) as applicable in situations where "the court must look beyond the bare record"). The purpose of the notice requirement is to prevent surprise to the opposing party and to enable the trial judge to give the motion adequate consideration. *Id.*

■ In this case, the March 7 motion was based on substantially the same facts upon which the March 4 motion was predicated. As such, those facts were already part of the record before the trial judge. Accordingly, the five-day notice requirement was inapplicable here. Moreover, the Post never requested additional time to respond to CPI's March 7 motion. Under these circumstances, we cannot conclude that the order granting CPI's motion for voluntary dismissal should be reversed because of inadequate notice to the Post.

The Post also contends that, aside from the notice issue, the trial court committed reversible error in granting CPI's motion to dismiss. In the ordinary case, a motion for voluntary dismissal pursuant to Superior Court Civil Rule 41(a)(2) (1989) is committed to the discretion of the trial court; this court will reverse only upon an abuse of

that discretion. *Brown v. Carr*, 503 A.2d 1241, 1248 (D.C.1986). The Post contends, however, that this is not an ordinary voluntary dismissal case because of the fact that CPI's demand for a jury trial was untimely. Relying primarily on *Noonan v. Cunard Steamship Co.*, 375 F.2d 69 (2d Cir.1967), the Post argues that where a plaintiff files a motion to dismiss without prejudice to overcome a failure to make a timely jury demand, the motion must be denied. In such cases, the Post argues, the trial court does not have discretion to permit voluntary dismissal.

In *Noonan*, the court stated that where a plaintiff seeks voluntary dismissal *"simply to ... overcome"* or *"for the sole purpose* of overcoming" an inadvertent failure to make a timely jury demand, the usual "reasons for deferring to the trial judge's exercise of discretion—his observation of the witnesses, his superior opportunity to get 'the feel of the case,' and the impracticability of framing a rule of decision where many disparate factors must be weighed— are inapposite...." *Noonan, supra*, 375 F.2d at 71 (citations omitted) (emphasis added). As an initial matter, however, we note that the rule prohibiting voluntary dismissal where dismissal is sought solely to overcome an untimely jury demand is not uniformly accepted. In *Hoffmann v. Alside, Inc.*, 596 F.2d 822 (8th Cir.1979) (per curiam), for example, the trial court granted plaintiff's motion for voluntary dismissal. The Court of Appeals affirmed the trial judge even though the defendant contended that plaintiff's motion was motivated "solely by a desire to circumvent his failure to timely request a jury trial." *Id.* at 823. Moreover, the court applied an abuse of discretion standard in reviewing the trial court's ruling. *Id.*

■ We need not decide in this case whether to adopt the Eighth Circuit or the Second Circuit rule. Here, CPI did not seek voluntary dismissal "for the sole purpose" of overcoming its failure to make a timely jury demand. *Cf. Noonan, supra*,

landlord-tenant action against the Post unless it prevailed in one of the other cases pending

between CPI and the Post.

375 F.2d at 71. To the contrary, CPI sought the dismissal because of the inefficiency of relitigating issues which had already been litigated in the preliminary injunction hearing before Judge Tignor and because of the ill health of its lead counsel. In circumstances such as these, the ordinary abuse of discretion standard applies.[17]

 In exercising its discretion when faced with a voluntary dismissal motion, the " '[c]ourt's inquiry primarily concerns whether the defendant will be subjected to legal prejudice' " if the court grants the motion. *Brown, supra,* 503 A.2d at 1248 (quoting *D.C. Transit System, Inc. v. Franklin,* 167 A.2d 357, 358 (D.C.1961)). To defeat the motion to dismiss, the defendant must show a " 'real and substantial detriment.' " *Id.* (citation omitted). Here, by requiring CPI to pay the Post's costs, the trial judge insured that dismissal would not impose duplicative expenses on the Post. Similarly, by permitting CPI to refile the case only if it obtained a favorable judgment in one of its other pending cases with the Post, the trial judge insured that the Post would be spared the prospect of vexatious litigation. The Post contends that the dismissal was prejudicial because it postponed resolution of the dispute between it and CPI. Because delay is concomitant with any voluntary dismissal, however, it, standing alone, is insufficient to establish legal prejudice. We therefore conclude that the trial judge acted within his discretion in granting CPI's motion for voluntary dismissal.

Accordingly, the judgment in No. 88–963 is reversed and the case remanded for further proceedings; the judgment in No. 88–258 is affirmed.

*So ordered.*

---

**17.** Even in a case where the defendant contends that a plaintiff's purported justification for seeking voluntary dismissal is merely a pretense, deference to the trial court is appropriate. In such cases, the trial judge is in a far better position than an appellate court to evaluate the facts and decide the true motivation for the motion to dismiss.