**CLAY PROPERTIES, INC.,
et al., Appellants,**

v.

**The WASHINGTON POST
COMPANY, Appellee.**

No. 88–963.

District of Columbia Court of Appeals.

Argued Nov. 27, 1990.
Decided March 17, 1992.

---

Louis Rabil, with whom William H. Jeffress, Jr. and Joe R. Caldwell, Jr., Washington, D.C., were on the brief, for Clay Properties, Inc., et al.

Jack McKay, with whom Christine M. Nicolaides, Washington, D.C., was on the brief, for The Washington Post Co.

Before ROGERS, Chief Judge, FERREN, TERRY, STEADMAN, SCHWELB, FARRELL, and WAGNER, Associate Judges, and MACK and BELSON *, Senior Judges.

STEADMAN, Associate Judge:

This appeal before the en banc court involves one episode in a protracted legal battle between the Washington Post Company ("the Post") on the one hand, and Ozzie Clay ("Clay") and Clay Properties Incorporated ("CPI") on the other, over ownership and control of a commercial building at 1523 L Street, N.W. ("the building"). CPI appeals from a grant of summary judgment in favor of the Post in the Post's eviction action. CPI contends that the trial judge erred in concluding as a matter of law that the Post, when it purchased the building at foreclosure, did not have notice of a master lease between Clay and CPI which CPI now wishes to enforce against the Post.

A panel of this court reversed this grant of summary judgment. At the same time, it affirmed, in a consolidated appeal involving the same parties, a grant of voluntary dismissal in different but related litigation.[1] *Washington Post Co. v. Clay Properties, Inc.,* 573 A.2d 1227 (D.C.1990). On the Post's petition for rehearing en banc,[2] the two appeals were severed and rehearing en banc granted only with respect to the appeal from the grant of summary judgment. Amended Order of Oct. 10, 1990, 580 A.2d 1042.[3] We now reverse, as did the panel,

---

* Judge Belson was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on July 24, 1991.

1. The Post was appellant in that appeal (No. 88-258), involving CPI's attempt to evict the Post from the building in a landlord-tenant action. (Many of the same issues were presented as in the appeal now before the en banc court.) The Post contended that the trial court improperly granted CPI's motion voluntarily to dismiss that law suit.

2. Statements in support thereof were filed by Riggs National Bank, Washington Area Bankers Association, Commercial Settlements, Inc., First American Title Insurance Co., and Columbia Real Estate Title Insurance Co., as *amici curiae.*

3. That Amended Order severed the two appeals and vacated only Part II of the panel opinion, dealing with the appeal from the grant of summary judgment.

the grant of summary judgment.[4]

## I

For ready reference, we reiterate here the relevant facts as set forth in Part I of the panel opinion. Clay purchased the building in 1979, and title was in his name.[5] In 1981, Clay and members of his family formed CPI to develop and operate commercial properties. On January 12, 1982, Clay, as owner of the building, and CPI, as lessee, executed a lease agreement ("Master Lease" or "Lease") which now lies at the center of this dispute. The Lease, which covered the land and entire building, contained a number of unusual provisions. Although the Lease was for a term of a year, it included 98 one-year options to renew which would take effect automatically unless CPI notified the landlord. For the period from 1982–1986, the Lease required CPI to pay rent of $500 per month for a building with rental market value of as much as $50,000 per month.[6] The Lease effectively gave CPI complete control of the building; CPI had full power to make alterations to the building or even to demolish and rebuild it. More importantly, the Lease entitled CPI to sublet any part of the building, designating itself as landlord, and to collect all rents.[7] Finally, the Lease provided that it would not be subordinate to any mortgage or lien placed on the property after execution of the Lease.

In November of 1984, to partially secure a commercial loan to finance business ventures unrelated to the building, Clay granted a second deed of trust on the building to First American Bank.[8] In the event of default, the Master Lease was assigned to First American, but it was not subordinated to this deed of trust In early 1987, First American foreclosed on the building and sold its interest to the Post. The Post closed on its purchase on March 31, 1987. When the Post took over the building, Clay, CPI, and Clay & Company [9] occupied two suites on the first floor of the building. On April 9, 1987, the Post gave Clay and his companies notice to vacate the space occupied by them within thirty days.

Since that time, the Post on one side and Clay and CPI on the other have been embroiled in litigation. On April 13, 1987, Clay, who was the defendant in a case filed by First American Bank in federal court in Virginia on the note for which Clay had given a second deed of trust on the building, filed a third-party complaint against the Post. The complaint, which named the Post as purchaser of the building, alleged wrongful foreclosure. The trial judge in the federal litigation dismissed the com-

---

**4.** During the course of this appeal, both Clay in his individual capacity and Clay Properties, Inc., have filed voluntary Chapter 11 bankruptcy petitions. To eliminate any question whether the automatic stay provision of 11 U.S.C. § 362 (1988) might affect the instant appeal, orders were obtained in both proceedings permitting the parties to "prosecute to final judgment the actions pending in the District of Columbia Court of Appeals, identified as App. Nos. 88–963 and 88–258, and to proceed in any other court to which the actions may be elevated or remanded."

**5.** Dealing with a motion for summary judgment, we present the facts in the light most favorable to CPI, the non-movant. *Bell v. Jones,* 566 A.2d 1059, 1061 (D.C.1989).

**6.** The Master Lease did provide for rent increases every four years for the first 29 years. Even by the year 2011, however, the Lease required CPI to pay monthly rent of only $1,000. The Lease also provided that any part of the "overage" of rent collected from tenants by CPI can be used for all financial obligations of Clay on the subject property or any other properties, or the profits can be divided between CPI and Clay in any manner agreed to by them. However, if Clay ceases to be the landlord, the Lease remains in effect with all benefits received by CPI from subletting to remain the sole possession of CPI or assigns. The Lease also provided that if the tenant is adjudicated a bankrupt, "the demised premises shall be surrendered to the tenant's assigns for and in consideration of the sum of $100."

**7.** The Master Lease also gave CPI an option to purchase the building at any time for the lesser of the appraised value, the landlord's present first trust mortgage, or $1.5 million. Moreover, in the event the landlord breached the Lease, CPI was entitled to receive $17 million in liquidated damages.

**8.** Clay had granted a first deed of trust to another bank in September 1984.

**9.** Clay & Company is another business entity owned by Clay.

plaint against the Post; the net result of that litigation was to settle in the Post's favor the question of who had the underlying fee title to the building.

On May 20, 1987, the Post filed a landlord-tenant action against Clay, seeking to evict Clay and his companies from the office space they occupied in the building.[10] In June, Judge Richter entered an interim protective order requiring Clay and his companies to make monthly rent payments into the court registry. In his answer to the Post's landlord-tenant complaint, Clay asserted CPI's rights to the building under the Master Lease.

On October 30, 1987, after tensions over control of the building escalated, and CPI began demanding that the building's tenants pay rent to CPI, the Post filed a civil action seeking to enjoin CPI from exercising any purported landlord rights in the building. A lengthy preliminary injunction hearing, at which one of the issues was the validity of the Master Lease, was held before Judge Tignor. Much of the evidence and testimony adduced at that hearing later became part of the record in the summary judgment motion subsequently filed in the Post's landlord-tenant case, which is the subject of this appeal.[11]

On December 17, 1987, before the outset of the preliminary injunction hearing in the Post's civil case, CPI filed a landlord-tenant action seeking to evict the Post from the building. CPI also filed suits for possession against other tenants in the building. In all these cases, CPI asserted the authority to evict under the terms of the Master Lease. CPI's eviction suit against the Post was scheduled for trial beginning March 10, 1988. Just prior to that date, the trial court granted CPI's motion for voluntary dismissal of the action without prejudice, over the opposition of the Post.[12]

Following the voluntary dismissal of CPI's action, the Post, as already mentioned, filed a motion for summary judgment in its own landlord-tenant suit against CPI. On June 30, 1988, Judge Goodrich entered an opinion and order granting summary judgment on the ground that the Master Lease, which was unrecorded, was unenforceable against the Post. Judge Goodrich's ruling rested on the determination that the Post was a bona fide purchaser without notice. CPI appealed from the grant of summary judgment in favor of the Post. It is this appeal that is before us now for en banc resolution.

## II

We review here the grant by a trial court of a plaintiff's motion for summary judgment. Therefore, we begin with a brief reiteration of the basic operative legal principles relating to a review of such trial court action, as recently set forth in *Hill v. White*, 589 A.2d 918 (D.C.1991). *See also Beckman v. Farmer*, 579 A.2d 618, 626–27 (D.C.1990).

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c). This court will uphold a summary judgment order "if (1) taking all reasonable inferences in the light most favorable to the nonmoving party, (2) a reasonable juror, acting reasonably, *could not* find for the non-moving party, (3) under the appropriate burden of proof." *Nader v. de Toledano*, 408 A.2d 31, 42 (D.C.1979) (emphasis in original; footnote omitted), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). The focus of our inquiry is twofold: first, we look to see if the moving party has met its burden of proving that no material fact remains in dispute, and then we also must

---

10. It is from this case that the appeal now before us (No. 88–963) arises.

11. At the time the Post's motion for summary judgment was entered, Judge Tignor had not yet ruled in the Post's civil case, and that case has been stayed pending this appeal.

12. It is from this case that the formerly consolidated appeal (No. 88–258) arose. See note 1 *supra*.

determine whether the party opposing the motion has offered "competent evidence admissible at trial showing that there is a genuine issue as to a material fact." *Nader*, 408 A.2d at 48. The burden on the nonmoving party is "that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* (quoting *First National Bank of Arizona v. Cities Services Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, *reh'g denied*, 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968)).

We turn to the question whether the Post met its burden here to show that, as a matter of law, it must be deemed a bona fide purchaser of the building and thus holds it free of CPI's unrecorded leasehold interest.

### A

Under D.C.Code § 45–801 (1990), a deed conveying an interest in real property is not effective against "subsequent bona fide purchasers" unless it is recorded.[13] A bona fide purchaser is one "who acquires an interest in property for a valuable consideration and without notice of any outstanding claims which are held against the property by third parties." 6A R. POWELL & P. ROHAN, THE LAW OF REAL PROPERTY ¶ 904[2][b], at 82–10 (1989) [hereinafter R. POWELL, REAL PROPERTY]. Because the Master Lease at issue in this case was not recorded, it was not effective against the Post if the Post was a bona fide purchaser.

D.C.Code § 45–801 (1990). To prevail in its motion, the Post had to establish that, on the then existing record, it must be deemed as a matter of law to have acquired the building without notice of the Master Lease.[14] In holding that it had done so, Judge Goodrich reasoned in critical part as follows:

> The Court agrees with defendants [Clay and CPI] that there were a number of occasions when plaintiff [the Post] had the opportunity to learn of the master lease. However, the Court does not feel that an awareness of the existence of the master lease was sufficient to place plaintiff on notice of the actual terms of the lease. The lease that plaintiff signed with CPI did not mention the master lease that CPI had with Mr. Clay and certainly did not inform plaintiff that CPI's master lease included ninety-eight annual options for renewal. Plaintiff searched title of the building prior to the foreclosure sale and again prior to closing. Since the master lease was unrecorded, plaintiff found nothing. Consequently, plaintiff could not have known that the master lease was still in existence. Plaintiff made a proper title search pursuant to D.C.Code § 45–801. The Code does not require purchasers to perform any other investigations even if they have a suspicion of a long term lease. If defendants desire the protection of the recordation statute, they should have complied with its requirements and recorded their master lease where plaintiff could have reviewed it

---

**13.** D.C.Code § 45–801 provides:

Any deed conveying real property in the District, or interest therein, or declaring or limiting any use or trust thereof, executed and acknowledged and certified as provided in §§ 45–306, 45–502, 45–601 to 45–604 and delivered to the person in whose favor the same is executed, shall be held to take effect from the date of the delivery thereof, except that as to creditors and subsequent bona fide purchasers and mortgagees without notice of said deed, and others interested in said property, it shall only take effect from the time of its delivery to the Recorder of Deeds for record. As we use the phrase "bona fide purchaser" in this opinion, it incorporates the notion of an · absence of notice of the unrecorded instrument.

Because the District's statute of frauds states that leases for more than one year cannot be created "except by deed," D.C.Code § 45–306 (1986), such leases must be recorded to be valid as against a subsequent bona fide purchaser. The parties here agree that the Master Lease, which was for one year but included 98 one-year renewal options, falls within the provisions of § 45–801 and would not be valid as against a subsequent bona fide purchaser. *See Paul v. Holloway*, 124 A.2d 587, 589 (D.C.1956). *See also South Street Inn, Inc. v. Muehsam*, 323 Mass. 310, 81 N.E.2d 821, 823 (1948).

**14.** It is undisputed that the Post paid valuable consideration for the building at the foreclosure sale.

and its terms. As a result of the foregoing facts, the Court deems plaintiff a "bona fide purchaser without notice."

We hold that Judge Goodrich misapprehended, and accordingly misapplied in this summary judgment context, the applicable law. *See Davis v. United States*, 564 A.2d 31, 36 (D.C.1989) (en banc) (some appellate courts apply "de novo" review of legal issues in mixed questions of fact and law).

■ There is no significant dispute that the Post was unaware of the exact terms of the Master Lease at the time of closing. As such, the Post did not have actual notice of CPI's interest in the building. Notice, however, may be actual, constructive, or inquiry. 6A R. POWELL, REAL PROPERTY, *supra*, ¶ 904[2][b], at 82–11.[15] Thus, even where a buyer does not have actual notice of a prior interest, the law may nevertheless charge him or her with notice where there is circumstantial evidence from which notice can be inferred as a fact. *See Rosenthal v. J. Leo Kolb, Inc.*, 97 A.2d 925, 927 (D.C.1953); *Manogue v. Bryant*, 15 App.D.C. 245, 261 (1899); *Mayor, etc., of City of Baltimore v. Whittington*, 78 Md. 231, 27 A. 984, 985 (1893). In this case, the issue is whether the Post may have been on inquiry notice of the Master Lease and its terms.

■ A purchaser is held to be on inquiry notice where he or she is aware of circumstances which generate enough uncertainty about the state of title that a person of ordinary prudence would inquire further about those circumstances. The purchaser is on inquiry notice of all facts and outstanding interests which a reasonable inquiry would have revealed. 6A R. POWELL, REAL PROPERTY, *supra*, ¶ 905[1][d][iv], at 82–57. *See, e.g., Rosenthal v. J. Leo Kolb, Inc., supra*, 97 A.2d at 927 (" '[t]he knowledge of facts or circumstances reasonably sufficient to put a person of ordinary prudence upon inquiry which, if pursued with proper diligence, would lead to the discovery of the actual condition of the title, is equivalent to knowledge direct and certain,' " quoting *Manogue v. Bryant, supra*, 15 App.D.C. at 261); *Williams v. Skyline Dev. Corp.*, 265 Md. 130, 288 A.2d 333, 353 (1972) (if the purchaser " 'had knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry, he will be presumed to have made such inquiry and will be charged with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued' ") (citation omitted).

■ CPI here alleges that several facts were sufficient to put the Post on inquiry notice of the Master Lease. First, and most importantly, CPI points out that in February 1986, the Post, which already occupied another structure adjacent to the building, entered into a three-year lease with CPI for two floors in the building. The lease identified CPI as lessor and was executed on its behalf by Clay as its president. Second, CPI asserts that the Post at least suspected that CPI was also the lessor to all the other tenants in the building.[16] Third, CPI argues that its own occupancy of two offices in the building was sufficient to put the Post on notice that CPI was a tenant operating under some

---

**15.** Strictly speaking, inquiry notice is itself a variety of constructive notice. However, because constructive notice "by more or less common acceptance ... has come to mean record notice," 6A R. POWELL, REAL PROPERTY, *supra*, ¶ 905[1], at 82–48, it is useful to treat inquiry notice as a distinct category of notice.

**16.** In February 1987, as the Post prepared to purchase the building, one of Clay's agents compiled for an agent of the Post a list of the leases in effect for the building's tenants. This compilation of leases indicated that CPI was the lessor to every tenant in the building. The compilation did not, however, include the Master Lease between Clay and CPI.

According to Judge Goodrich's order, it was undisputed that the Post's agent did not review this compilation list. CPI claims that prior to closing, however, the Post did suspect that other tenants in the building had leases with CPI as lessor. When asked if he knew on March 31, 1987 (the day of the closing) "that all of the tenants in the building had some sort of lease agreement prior to that time with Clay Properties, Incorporated," a representative of the Post testified: "Well, we assume they did since they were tenants in the building." After closing, the Post assertedly confirmed this suspicion by independently compiling information about the leases in effect in the building from the building's tenants themselves.

type of lease from the record title holder.[17] CPI contends that these facts were sufficient to induce a prudent purchaser to inquire further about CPI's interest in the building, and that a reasonable inquiry would have led the Post to discover both the existence and the terms of the Master Lease.[18]

**B**

Our inquiry, then, in ruling upon the grant of summary judgment is whether as a matter of law, these circumstances were such that a person of ordinary prudence would not have made inquiry or investigated further. *Manogue v. Bryant, supra; Williams v. Skyline Dev. Corp., supra.* If CPI relied only upon its occupancy of offices within the building and the opportunity the Post had to examine the tenants' leases prior to the foreclosure sale and settlement, we might well be compelled to conclude that no duty to inquire arose. First, CPI's claim of continuous and open occupancy of two offices on the first floor of the building appears insufficient in itself to trigger a duty to inquire in this case. When physical possession is relied upon as a circumstance providing notice, " '[i]t must be open and unambiguous, and not liable to be misunderstood or misconstrued' " and "[i]t must be sufficiently distinct and unequivocal so as to put the purchaser on his guard." *Hayward v. Mayse,* 1 App.D.C. 133, 140 (1893) (quoting *Townsend v. Little,* 109 U.S. 504, 511, 3 S.Ct. 357, 361, 27 L.Ed. 1012 (1883)). The type of possession necessary to give rise to inquiry notice must be inconsistent with the record title, otherwise it will not be notice of the unrecorded interest. *Chillemi v. Pennsylva-*

*nia Rubber Co.,* 58 App.D.C. 394, 396, 31 F.2d 638, 640 (1929). Here, CPI occupied through Clay, the record title holder, along with another one of Clay's companies. There were also other tenants in the multi-unit office building. Under these circumstances, CPI's occupancy seems to convey no suggestion that it is inconsistent with the record title in Clay. CPI's occupancy appears neither distinct nor unequivocal, *see Hayward, supra,* 1 App.D.C. at 140-41, but instead consistent with the record title since CPI occupied with and through Clay, its president and the record title holder. *See Cohen v. Thomas & Son Transfer Line, Inc.,* 196 Colo. 386, 586 P.2d 39, 41 (1978).

We turn next to CPI's claim that the Post had an opportunity to ascertain CPI's position as landlord for all tenants in the building and its claim under the Master Lease by examining the leases of the other tenants. This argument seems to presuppose that a purchaser has an absolute duty to examine all leases in a multi-unit building to protect itself against *all* unrecorded interests. Whatever inquiry, if any, a lessee's possession of premises may trigger as to that lessee's interest, it is quite a different question as to whether such an inquiry or its absence may affect unrecorded interests of claimants not in possession. A party out of possession who has a recordable interest which he does not choose to record can hardly be confident of protection in such a derivative manner. We agree with the principle that "absent any unusual equity, a court should decide a question of title such as this in the way that will best support and maintain the integrity of the

---

**17.** Presumably, CPI's right to possess the two suites arose from the terms of the Master Lease itself. However, the record reflects sharp disagreement about whether the Post in fact requested to see copies of all leases in effect in the building, which would have included the Master Lease. There is also disagreement about whether Clay and his agents concealed the Master Lease from the Post when the Post attempted to learn about the leases in effect in the building. Because these questions involve considerable genuine issues of material fact, they are inappropriate for summary judgment. Super.Ct.Civ.R. 56(c).

**18.** CPI also argues that an employee of First American Bank knew about the Master Lease and implies that such knowledge should be imputed to the Post. However, neither the knowledge of a deed of trust holder nor that of the grantor at a foreclosure sale is automatically imputed to the purchaser. This flows from the rule that a purchaser without notice who takes from a party with knowledge of an unrecorded interest may nevertheless be deemed a protected bona fide purchaser. G. THOMPSON & J. GRIMES, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY § 4314, at 375 (1963); *Palamarg Realty Co. v. Rehac,* 80 N.J. 446, 404 A.2d 21, 27 n. 6 (1979).

recording system." *Palamarg Realty Co. v. Rehac*, 80 N.J. 446, 404 A.2d 21, 25 (1979).

It is CPI's third argument, however, that forecloses summary judgment here. In light of the principles of inquiry notice set forth above and the facts alleged by CPI, which for purposes of summary judgment must be taken as true, it was erroneous to conclude as a matter of law on the existing record that the Post had no duty to inquire further into the true nature of CPI's apparent interest. The Post, because its own lease was with CPI, knew that CPI presumably had the power to lease space in the building. At the same time, the Post knew that Clay, not CPI, was the record title holder. Where a party other than the record owner of property exercises an apparent right to enter into leases of that property as the lessor, it can be an indication that the lessor may have some interest in the property inconsistent with record title. Because the possibility of such an interest " 'is inconsistent with a perfect right in him who proposes to sell,' " *Hayward v. Mayse, supra,* 1 App.D.C. at 140 (quoting *Townsend v. Little, supra,* 109 U.S. at 511, 3 S.Ct. at 861), it cannot be said, without more, that a buyer of ordinary prudence would not inquire further to determine the nature of that interest.

The Post cites to us language from the *Hayward* case: " 'When possession is relied on as giving constructive notice, it must be open and unambiguous, and not liable to be misunderstood or misconstrued. It must be sufficiently distinct and unequivocal, so as to put the purchaser on his guard.' " 1 App.D.C. at 140, quoting *Townsend v. Little, supra,* 109 U.S. at 511, 3 S.Ct. at 361. The Post relies on this passage in arguing that it was not on inquiry notice of CPI's rights because CPI's possession or other indication of a claim was not "distinct and unequivocal."

As the quoted passage from *Hayward* makes clear, this requirement finds its normal application in cases where the holder of an unrecorded interest asserts that his or her physical *possession* constituted inquiry notice of his or her interest in the property. Courts developed the "distinct and unequivocal" requirement largely to deal with situations where, after a purchaser bought from one member of a family living on a parcel of land, another family member also living on the parcel asserted an unrecorded interest. *See, e.g., Kirby v. Tallmadge,* 160 U.S. 379, 383–89, 16 S.Ct. 349, 350–53, 40 L.Ed. 463 (1896), and cases cited therein.

The focus of the "distinct and unequivocal" requirement, however, is on the facts triggering inquiry notice, not the outstanding interest itself.[19] Mere possession gives no indication of the scope or nature of any unrecorded interest; only further inquiry can establish that. The requirement, it must be noted, is that such possession must be *"sufficiently* distinct and unequivocal *so as to put the purchaser on his guard."* The same test may be properly applied to the facts in other situations which are asserted to trigger inquiry notice. Here CPI, a separate corporate entity, was by itself a direct lessor to the Post.[20] Contrary to the Post's assertion, while possession of a person not the record owner is often a source of inquiry notice, it is not the sole possible source. *See* 6A R. POWELL, REAL PROPERTY, *supra,* ¶ 905[1][d]; AMERICAN LAW OF PROPERTY § 17.11–.30 (Casner ed. 1952).

The Post's reliance on *Rogers v. Rawlings,* 54 App.D.C. 361, 298 F. 683 (1924), in support of its position is also misplaced. *Rogers* involved a contract for the sale of rental property under which the seller promised delivery of "good record title" in

---

19. In *Hayward* itself, for example, the rival claimant had "practically abandoned possession of the property," and failed to present evidence of the nature and character of the alleged caretaking by a neighbor. The court stated: "This is not, in our opinion, the open, distinct, and unequivocal possession that is required to put a purchaser upon inquiry." 1 App.D.C. at 141.

20. It is CPI's authority to lease space in the building, not its possession of two suites, that raises the question, not here adequately disposed of for summary judgment, whether a prudent purchaser should have inquired about CPI's interest.

exchange for the buyer's assumption of an existing deed of trust. After a title search, but before closing, the buyer discovered that the deed of trust authorized the mortgage holder to collect all rents from the property until the deed of trust was fully paid. In ruling that the buyer was not obligated to perform, the court indicated that the seller had not delivered "good record title," as called for in the contract. The court stated:

> *At that stage of the transaction* [the buyer] had a right to assume that the provisions of the deed of trust were not materially different from the usual and ordinary provisions of such instruments.... The purchaser had a right to expect that good record title meant title subject only to a deed of trust for $30,-000 with the usual provisions.

54 App.D.C. at 363, 298 F. at 685 (emphasis supplied). The *Rogers* opinion thus does not suggest that a buyer who knows of the existence of an encumbrance at the time of closing need not inquire as to the unusual conditions of the encumbrance. To the contrary, the *Rogers* court excused the buyer from his contractual obligation to perform precisely because he did inquire about the terms of the deed of trust prior to closing.[21]

### C

Here, it was unquestioned that the Post, which now claims to be a bona fide purchaser without notice, entered into a lease with CPI in the stated capacity of lessor covering two floors of the building for a considerable length of time. It may be, as the Post seems to suggest, that normal practice in the trade or the parties' course of dealing was such as to indicate, for example, that CPI was just a leasing agent or the alter ego of the record owner. The parties have argued at great length about the nature of all the surrounding facts and circumstances which might bear upon the question whether the Post had any duty to inquire. Many of these facts are in sharp dispute. It may be that when the entire circumstances are finally determined, the Post will be entitled to a judgment in its favor as a matter of law. It is not so entitled on this existing record at the summary judgment stage.

 This is hardly to say that a holder of an unrecorded interest may rest confident of his or her position. A purchaser who conducts a proper title search, as the Post did here, is fully protected against all unrecorded interests falling within the recording statute, with the exception of any as to which the purchaser has actual or inquiry notice. The integrity of the recording system dictates that such notice must be clearly shown, and it is the claimant of an unrecorded interest who bears the burden of proof to show that the purchaser from the record title holder was on such notice.[22] But contrary to the suggestion of

---

**21.** The Post also cites several cases from other jurisdictions in support of its claim that knowledge of the existence of a lease does not charge a buyer with notice of its unusual terms. In those cases, however, the issue of inquiry notice was not relevant because of the peculiarities of state law. *Mister Donut of America, Inc. v. Kemp,* 368 Mass. 220, 330 N.E.2d 810 (1975) and *South Street Inn, Inc. v. Muehsam,* 323 Mass. 310, 81 N.E.2d 821 (1948), both construe a Massachusetts statute which provides that if a lease of more than seven years is not recorded, subsequent purchasers are protected unless they have *actual* notice. In both cases, however, knowledge of a lease would have provided inquiry notice of the lease's terms. *Mister Donut, supra,* 330 N.E.2d at 812; *South Street Inn, supra,* 81 N.E.2d at 823. In *Knowles v. Wholesale Electronic Supply, Inc.,* 388 So.2d 426 (La.Ct.App. 1980), the court ruled that notice of a lease did not bind a subsequent purchaser unless the

lease was recorded. Apparently, under Louisiana law, if a lease is not recorded, a subsequent purchaser takes subject to the lease only if he or she *intends* to be bound by the provisions of the lease. *Id.* at 427. Neither the Massachusetts statute nor the Louisiana doctrine is the law in the District of Columbia.

**22.** Although we find no holding in our jurisdiction addressing this issue and the courts throughout the country are split, we think this allocation of proof is the more consistent with the intent of the recording statute. See the numerous cases cited in Annotation, *Presumption and Burden of Proof as Regards Good Faith and Consideration on Part of Purchaser or One Taking Encumbrance Subsequent to Unrecorded Conveyance or Encumbrance,* 107 A.L.R. 502 (1937) and supplements.

the trial court, a title search alone cannot always completely exonerate a purchaser; the doctrine of inquiry notice may require more. The facts presented here simply cannot be deemed, as a matter of law at this summary judgment stage of the proceeding, to have conclusively precluded any duty on the Post to inquire.[23]

*Reversed and remanded.*

---

**23.** The fact that a purchaser of ordinary prudence might have inquired about CPI's interest in the property, however, would not establish as a matter of law that the Post was *not* a bona fide purchaser. The record reveals sharp dispute about numerous factual aspects, including what any inquiry by the Post would have revealed. Additionally, the Post has raised a number of other objections to the Master Lease, including fraud, abandonment, and unconscionability, which might also preclude its enforcement against the Post. We therefore must reject CPI's request that we direct the trial court to enter summary judgment for CPI declaring that the Post was not a bona fide purchaser.